NATARE CORPORATION, Plaintiff,

v.

AQUATIC RENOVATION SYSTEMS
INC., d/b/a A.R.S., Inc., and Stewart
J. "Jason" Mart, Defendants.

No. IP 95–C–0145 B/S.

United States District Court,
S.D. Indiana,
Indianapolis Division.

Dec. 4, 1997.

Donald E. Knebel, Dwight D. Lueck, Barnes & Thornburg, Indianapolis, IN, for Plaintiff.

Michael L. Einterz, Indianapolis, IN, James D. Crum, Coots Henke & Wheeler, Carmel, IN, for Defendants.

### ENTRY GRANTING PLAINTIFF'S MOTION TO ENFORCE SETTLEMENT

BARKER, Chief Judge.

This matter comes before the Court on Plaintiff's Motion to Enforce Settlement.[1] After full consideration, for the reasons explained below, the Motion is GRANTED. We find that the parties, having previously reached a binding and enforceable settlement agreement, must now abide by that agreement.

### FINDINGS OF FACT

This case arises out of a patent dispute between Plaintiff, Natare Corporation ("Natare"), and Defendants, Aquatic Renovation Systems, Inc. and Stewart J. "Jason" Mart (hereafter collectively known as "Mart"). The litigation commenced with Natare's Complaint of February 3, 1995. Shortly thereafter, Mart retained attorney James D. Crum ("Crum") to represent him to settle the dispute or, if necessary, to take it to trial. Mart did not impose any express limitations on Crum's authority to represent him generally or to enter into settlement agreements, with the sole exception of requesting that he, Mart, be allowed to sign off on the final agreement.

The evidence established that the parties discussed settlement from the commencement of the litigation, but settlement discussions began in earnest on March 17, 1997 during a settlement conference before Magistrate Judge Shields. Crum attended the settlement conference on behalf of Mart. Mart did not personally attend the conference. During the conference, Natare presented a proposed consent decree to Crum (Exhibit A to the Motion; Exhibit 1 at the hearing) and informed Crum that the execution of the consent decree was a prerequisite to any settlement. The terms of the consent decree do not require Mart to pay monetary damages to Natare, but do require Mart to concede infringement of the subject patent.

Crum reported on the discussions which occurred at the March 17th settlement conference to Mart later that same day. Mart told Crum that he felt there were other issues not addressed in the consent decree that also needed resolution prior to a settlement. Specifically, Mart was concerned that Natare might sue Mart's customers for patent infringement if the case settled and, further, he wanted any settlement to be confidential. At no time during the discussions with Crum did Mart indicate that the consent decree was unacceptable or impose restrictions on Crum's authority to settle the case.

Thereafter, in response to Mart's requests communicated by and to Crum, Natare drafted a covenant not to sue, agreeing not to sue Mart's customers. Regarding confidentiality, Natare sent to Crum a letter dated March 25, 1997, providing:

> Natare is prepared to agree that it will not issue a general press release on the resolution of this dispute with [Defendants], will not make a generalized release to the trade press on the topic, nor will it make specific reference to [Defendants] as subjects of that Decree if it makes reference to the Decree in future generalized advertising.

Plaintiff's Exhibit 2. Mart did not expressly respond to this letter, but there is no evidence that Mart had any dispute over or disagreement with the proposed confidentiality agreement. In a letter dated April 22, 1997, Crum expressly conveyed Mart's acceptance of two parts of the agreement with Natare—the Consent Decree and the Covenant Not to Sue—and implied that the confi-

1. A hearing on the motion was held on November 24, 1997, in which Stewart J. "Jason" Mart and James D. Crum testified. At that time, the Court also heard oral arguments from both sides.

dentiality issue was resolved as well. That letter provided:

> This will confirm this morning's conversation regarding our attempts to resolve the above-mentioned litigation. The Consent Decree and Covenant Not to Sue previously provided are acceptable. However, we believe one additional collateral agreement is necessary to avoid future litigation. We will provide your client a detail of the termination method being used by Aquatic, and ask that Natare make a determination of whether the method is in violation of the subject patent. If it is not, then a stipulation to that effect should conclude this litigation.

Plaintiff's Exhibit 4.

Regarding his statement that "[t]he Consent Decree and Covenant Not to Sue previously provided are acceptable," Crum testified under oath that he wrote that statement only after Mart had "communicated to [Crum] that the consent decree and covenant not to sue were acceptable." Mart also testified that he had discussed the terms of the consent decree with Crum prior to Crum's April 22, 1997 letter without ever imposing any limitations on Crum's authority to enter into a settlement that included the consent decree. In fact, Mart acknowledged that he first saw the consent decree in "late March or early April . . . right before May 9, 1997," and did not express any misgivings about the decree until late May, well after the April 22, 1997 letter had been sent to and received by Natare's counsel.

Mart wrote a letter to Crum, dated May 9, 1997, regarding the final issue relating to Mart's termination method that Crum had raised with Natare, without mentioning any of his purported concerns about any other issues, including the consent decree. In response to Crum's April 22, 1997 letter, Natare, in a letter dated May 15, gave its stipulation that the termination method then being used by Aquatic did not violate the subject patent, thus satisfying the lone, remaining condition for settlement as set out in Crum's April 22, 1997 letter. The May 15, 1997 letter from Natare concluded, saying "[n]ow that this issue has been resolved, my client and I look forward to the prompt execution of the Consent Decree." Plaintiff's Exhibit 8. Based on this correspondence, Crum testified that he believed that "there was an agreement" between the parties, a view also shared by Natare's counsel.

At that point, apart from securing the signatures of the parties on the relevant documents, a final agreement had been achieved which allowed the litigation to be concluded. However, when Crum contacted Mart to secure his signature on the consent decree, Mart refused to sign primarily on the grounds that he did not want to admit that he infringed the subject patent. On July 11, 1997, Crum withdrew as counsel for Mart.

## CONCLUSIONS OF LAW

Natare seeks to have the Court enforce the settlement agreement achieved by the parties' attorneys based on their written and oral negotiations. Mart maintains that an agreement was never reached and that Crum did not have authority to bind Mart to an agreement. Plaintiff's motion distills into whether Crum had authority to bind Mart to a settlement agreement and, if so, whether an enforceable settlement agreement was actually reached.

### I. CRUM HAD AUTHORITY TO BIND DEFENDANTS

"A settlement agreement is merely a contract between the parties to the litigation," and the parties' dispute regarding the settlement agreement at issue is therefore governed by Indiana contract law. *Carr v. Runyan*, 89 F.3d 327, 331 (7th Cir.1996). Under Indiana agency and contract law, a principal will be bound by a contract its agent enters into on its behalf only if the agent had actual or apparent authority, or if the principal subsequently ratifies the agreement. *Id.* Actual authority exists where the principal has authorized the agent to enter into such a contract on its behalf. *Id.* The authorization may be implicit, arising from the actions by the principal that would lead a reasonable agent to believe he possessed such authority. *Id.*

Natare contends that Crum had both actual and apparent authority to enter into a

settlement agreement on Mart's behalf. Prior to September 1996, Natare clearly would have been correct in asserting that, by virtue of Crum's status as Mart's attorney in the litigation, Crum had apparent authority to bind Mart to a settlement agreement. *See Ferrara v. Genduso,* 214 Ind. 99, 14 N.E.2d 580, 581 (1938); *Black v. Krauss,* 119 Ind. App. 529, 85 N.E.2d 647, 651 (1949). However, in September 1996, the Indiana Court of Appeals in *Gravens v. Auto–Owners Ins. Co.,* 666 N.E.2d 964 (Ind.Ct.App.1996), cast doubt on Indiana's long-standing doctrine that an attorney has authority to bind the client to a settlement without the client's consent, holding instead "that the requirement that an attorney must obtain his client's authority or consent to settle a case is implicit in the client's right to exercise ultimate authority over the settlement of a case as guaranteed by Prof. Cond. R. 1.2(a)." *Id.* at 965. Even more pointedly, the Indiana court held that "an attorney does not have authority to compromise an action merely by virtue of the attorney-client relationship." *Id.* at 966.

In *Gravens,* the plaintiff hired an attorney to pursue his claim against his insurance company. *Id.* at 964–65. The plaintiff and his attorney did not discuss the amount for which the plaintiff was willing to settle. *Id.* Instead, the attorney proceeded to quickly settle the case, without allowing an adequate opportunity for the plaintiff to communicate his settlement preferences. *Id.* The Indiana Court of Appeal's opinion lacks any mention of ongoing communications between the attorney and his client. Indeed, in *Gravens,* the attorney's sole source of authority for settling was based on the notion that attorneys have the inherent authority to settle the cases they have been hired to litigate. *Id.* Further, there was no contention that the attorney in *Gravens* had implied authority to settle his client's claim based on acts or omissions by his client.

After *Gravens* was handed down, Federal District Court Judge Robert Miller of the Northern District of Indiana, in *Koval v. Simon–Telelect, Inc.,* 979 F.Supp. 1222 (N.D.Ind.1997), correctly recognized *Gravens'* inconsistency with previous Indiana case law, in light of which he certified the following question to the Indiana Supreme Court: "If an attorney settles a claim as to which the attorney has been retained, but does so without the client's consent, is the settlement binding between third parties and the client." *Id.* at 1228. The Indiana Supreme Court accepted the certified question in an order issued October 31, 1997 and, as of the date of this entry, has yet to rule on the matter.

■ Although *Gravens* casts doubt on whether Crum had apparent authority to bind Mart based only on the attorney-client relationship, we do not feel constrained to await the Indiana Supreme Court's response to the certified question before resolving the issues now before us. Indiana law remains clear on issues of actual authority: "Actual authority is that authority that a principal gives, either expressly or impliedly, to his agent." *Northern Assurance Company of America v. Summers,* 17 F.3d 956, 960 (7th Cir.1994) *citing Indiana Dept. of Pub. Welfare v. Chair Lance Serv., Inc.,* 523 N.E.2d 1373, 1377 (Ind.1988). Attorneys have implied authority to settle if their clients' actions or omissions imply such authority. *See Evansville Improvement Co. of Vanderburgh County v. Gardner,* 75 Ind.App. 401, 128 N.E. 471 (1920). Indeed, the Indiana Supreme Court has held that "implied authority may [] arise from a course of conduct showing that the [principal] has repeatedly ratified acts of the same kind." *Indiana Department of Public Welfare v. Chair Lance Service, Inc.,* 523 N.E.2d 1373, 1377 (Ind. 1988); *see also Northern Assurance Company of America v. Summers,* 17 F.3d 956, 960–61 (7th Cir.1994).

■ This litigation had been ongoing for over two years before the purported settlement agreement was reached. During that time, Mart had innumerable opportunities to inform Crum of any limitations he wished to place on Crum's authority to negotiate on his behalf and to settle the dispute, but the record before us discloses that Mart never imposed such limitations. Instead, Mart, himself, encouraged the idea of settlement and authorized Crum to represent him at settlement conferences and during settlement negotiations. The evidence discloses

that Mart and Crum conducted ongoing dialogue on this matter throughout the spring of 1997, and not until late May did Mart indicate any disagreement over or displeasure with the terms of the consent decree. Prior to that time, Crum expressed reservations only with regard to the need for a confidentiality agreement and a covenant not to sue. As to those issues, his actions and words suggested that once those concerns were resolved, settlement would be accomplished. Prior to Crum's sending his April 22, 1997 letter to Natare, Mart had explicitly communicated to Crum that the consent decree and the covenant not to sue were acceptable, which Crum then conveyed to Natare in the April 22nd letter. After receiving a copy of the consent decree in early May, however, Mart decided that he did not like its terms. Instead of communicating his objections to Crum immediately about the proposed Consent Decree, thus allowing Crum to revoke his April 22, 1997 settlement offer, Crum remained silent for several weeks, during which time Natare communicated its acceptance of the offer and readiness to execute the final settlement agreement. Mart's actions and omissions as well as his words give rise to a reasonable implication that Crum had had full authority from Mart to enter into a settlement agreement with Natare on Mart's behalf. *See Northern Assurance Co. of America v. Summers,* 17 F.3d 956, 960 (7th Cir.1994). Accordingly, we hold that Crum did in fact act in accordance with that authority when he entered into the settlement agreement with Natare on behalf of Mart.

## II: THE PARTIES REACHED A BINDING, ENFORCEABLE SETTLEMENT AGREEMENT

Having determined that Crum had implied authority to bind Mart to the settlement agreement with Natare, we next consider whether an enforceable agreement was actually reached as a result of the negotiations between Crum and Natare's attorney, Dwight D. Lueck ("Lueck"). Natare contends that an enforceable settlement agreement was achieved on May 15, 1997 when Natare agreed by stipulation that Aquatic's then-current termination method did not in-

fringe the subject patent, made in response to Mart's demand. Mart rejoins that a settlement agreement was not reached because no confidentiality agreement had been reached between the parties and "[t]herefore a critical part of the agreement was not in place."

█ To create a binding contract, it must be the result of an offer, an acceptance of that offer, and a meeting of the minds between the contracting parties. *See Straub v. B.M.T.,* 645 N.E.2d 597, 598 (Ind.1994); *Pinnacle Computer Services, Inc. v. Ameritech Publishing, Inc.,* 642 N.E.2d 1011, 1013 (Ind.Ct.App.1994). Although some form of assent to the terms of the contract is necessary, "the validity of a contract is not dependant upon the signature of the parties." *International Creative Management, Inc. v. D & R Entertainment Co., Inc.,* 670 N.E.2d 1305, 1312 (Ind.Ct.App.1996).

█ In the instant case, the parties have not signed an agreement, but other forms of assert establish that they reached a binding settlement agreement. The parties clearly had a meeting of the minds on and agreed to the terms of the consent decree and the covenant not to sue, as evidenced by Crum's April 22, 1997 letter to Natare, in which he states that "the consent decree and the covenant not to sue previously provided are acceptable." That letter also contained Mart's offer to settle the litigation on the remaining condition that Natare stipulate that Aquatic's then-current termination method did not infringe the subject patent, which condition Natare accepted in a letter dated May 15, 1997. The parties believed that Natare's acceptance of this condition resulted in an agreement between them, thus, the settlement agreement was culminated. *See Bain v. Board of Trustees of Starke Memorial Hospital,* 550 N.E.2d 106, 110 (Ind.Ct.App. 1990).

█ Mart's contention that a confidentiality agreement was critical to the agreement and that it has not ever been executed is not supported by the evidence. In the March 25, 1997 letter to Crum, Natare spelled out its offer to adhere to specific terms of confidentiality in response to Mart's concerns about

the need for a confidentiality agreement. Significantly, Mart never explicitly responded. In a letter dated April 22, 1997, however, Crum implicitly acknowledged that the confidentiality issue had been resolved when he stated that the stipulation regarding the termination issue was the only issue remaining unresolved. An acceptance of an offer may occur by acts which manifest the acceptance and, in this case, the actions by Mart clearly constituted an acceptance to the confidentiality agreement outlined in Natare's March 25, 1997 letter. *See Pinnacle Computer Services, Inc. v. Ameritech Publishing, Inc.,* 642 N.E.2d 1011, 1013 (Ind.Ct.App. 1994); *Rockwood Mfg. Corp. v. AMP, Inc.,* 806 F.2d 142, 144 (7th Cir.1986). The confidentiality agreement was thus in place prior to the May 15, 1997 acknowledgment of the parties' agreement on the consent decree and the covenant not to sue, and the May 15, 1997 communication became the final step in the settlement process. Having concluded that a settlement agreement, binding on both parties, was achieved, Mart is obligated now to fulfill that agreement, and so is Natare.

 "The judicial policy of Indiana strongly favors settlement agreements." *Klebes v. Forest Lake Corp.,* 607 N.E.2d 978, 982 (Ind.Ct.App.1993); *See Isby v. Bayh,* 75 F.3d 1191 (7th Cir.1996) (federal policy favors settlement). Settlements allow our courts to operate more efficiently and, equally important, allow the parties to fashion the outcome of their disputes through mutual agreement. Although settlement agreements differ from court ordered judgments, such agreements are nonetheless binding on the parties. Fortunately, in most cases, a settlement agreement signals the end of the litigation; however, as evidenced in this case, such is not always true. In this case, Mart seems to have developed misgivings about his agreement and has refused to carry out his obligations under his agreement, forcing Natare to seek judicial enforcement. This Court has the authority to enforce the parties' settlement agreement, *see In the Matter of VMS Limited Partnership Securities Litigation,* 103 F.3d 1317, 1321 (7th Cir.1996), and, in view of our conclusion that a binding and enforceable settlement agreement was reached, Defendant's Motion to Enforce Set-

tlement is GRANTED. A Judgment reflecting the terms of the parties' agreement as we have discerned them to be from the motion, brief and evidence adduced at the hearing will be entered. The parties are directed to inform the Court within ten days from the date of this entry whether, in view of the confidentiality agreement, either wishes to have the Judgment, which shall incorporate the terms of the parties' agreement, entered under seal.