**Ernest N. SCOTT, Ivan L. Scott, Janet E. (Scott) Oberlander, Jeanne D. Scott, Appellants–Respondents,**

**v.**

**Elva RANDLE, Executrix of the Estate of Edna P. Sager, Ralph L. Scott, and Lafayette Bank and Trust Company of Lafayette, Indiana, Appellees–Petitioners.**

No. 09A02–9612–CV–832.

Court of Appeals of Indiana.

April 23, 1998.

Rehearing Denied July 7, 1998.

Jim Brugh, Logansport, for Appellants–Respondents.

James V. McGlone, Stuart & Branigin, Lafayette, for Appellees–Petitioners.

## OPINION

SULLIVAN, Judge.

Appellants, Ernest N. Scott, Ivan L. Scott, Janet E. Oberlander, and Jeanne D. Scott ("Ernest Group"), appeal the trial court's determination that their attorney, Eric Allen (Allen), entered into a binding settlement agreement (Agreement) with Elva Randle (Elva), Ralph Scott (Ralph), and Lafayette Bank and Trust Company.

We affirm.

Appellants assert three issues on appeal, which we restate as follows:

(1) There was insufficient evidence supporting the trial court's finding of an enforceable settlement agreement.[1]

(2) The trial court erred by not issuing special findings regarding attorney fees in its order enforcing the settlement agreement.

(3) The trial court erred by permitting attorneys arguing the case to testify at the hearing upon Elva and Ralph's motion to enforce the settlement agreement.

Because we conclude that Allen had both actual and apparent authority to create a binding settlement agreement, we need not address the issue whether the Ernest Group's post-execution conduct constituted ratification of the Agreement. Additionally, we hold that the trial court was not required to issue findings of fact regarding attorney fees because the trial court bifurcated the issues in dispute, and the matter of attorney fees is awaiting this court's decision regarding enforcement of the Agreement. Finally, the court did not err by permitting the attorneys to testify because the Ernest Group offers no evidence that the testimony prejudiced their case.

In 1979, Edna Sager executed a will giving her husband Clarence a life estate in her undivided interest in 440 acres owned by them as tenants in common, with a remainder to her niece Elva Randle. Clarence's will contained a like provision. If Edna survived Clarence, all her remaining assets

1. This issue has been very recently decided in the setting of a settlement agreement reached as a result of Alternative Dispute Resolution mediation. *Koval v. Simon–Telelect, Inc., et al.,* (1998) Ind., 693 N.E.2d 1299. The decision was in response to a question certified to the court by Federal District Judge Robert Miller of the Northern District of Indiana. *Koval v. Simon Telelect, Inc.* (N.D.Ind.1997) 979 F.Supp. 1222. The question was: "If an attorney settles a claim as to which the attorney has been retained, but does so without the client's consent, is the settlement binding between third parties and the client?" Our Supreme Court stated: "The answer to this question is the same as to many others: it depends." 693 N.E.2d at 1301. The holding in *Koval* is more thoroughly discussed *infra.*

would go to Elva. Clarence died before 1984.

In 1984, Edna executed a will and trust agreement. Elva took nothing under the provisions of the second will and the trust. Edna died in December 1989. The first will, benefitting Elva and Ralph, was admitted to probate in Carroll County Circuit Court, and the second will and trust agreement, benefitting the Ernest Group, was admitted to probate in Tippecanoe Circuit Court. Both wills were subsequently challenged, and the actions eventually consolidated in the Cass Circuit Court on April 14, 1993. The matter was set for trial on April 25, 1994.[2]

In June 1990, Eric Allen (Allen) entered his appearance for each member of the Ernest Group to defend the will contest filed by Elva. Allen continued to represent each member throughout the litigation until August 1994. Barry Emerson (Emerson) and James McGlone (McGlone) represented Elva and Ralph. McGlone's representation began in 1984 when the documents were signed. Charles Traylor (Traylor) and Donald Tribett (Tribett) represented the Trustee, Lafayette Bank and Trust Company, and Donald Smith (Smith), the personal representative for the Tippecanoe County Estate, represented himself.

At a mediation effort in August 1993, Allen represented all members of the Ernest Group. Jeanne was not present. Janet, who left the mediation early, told Allen: "Do what you think is right. I'll rely on Dad." Record at 552. Allen testified that Janet was totally disinterested in the case, and that she always deferred to her father. In addition, Janet never called him and, from the very beginning, showed as little interest as anyone he had seen in any case. The mediation failed to produce an agreement. However, in mid-March 1994, the parties resumed settlement discussions.

On April 7, 1994, eighteen days before the scheduled trial date, Allen wrote to Ernest, Ivan and Janet, notifying them that he had received a settlement proposal. Allen expressed his belief that while he had an ethical obligation to convey the proposal to each member of the group, the members deferred to Ernest when it came to making major decisions regarding the litigation:

> "I am dictating this letter with the hope that I will personally be able to get in contact with each of you today and possibly have a conference call later this afternoon or this evening to discuss the contents of this letter. *I know that my primary communication in this case has been through Ernie and that Ivan and Janet are deferring to Ernie on the major decisions,* but since I have entered my appearance for all of you, I have an obligation under our ethical rules to convey the settlement proposal to each of you, individually." Record at 254. (Emphasis supplied).

This letter crystallizes the fact that as of receipt of the April 7 letter, Ivan, Janet and Jeanne were fully aware that: (1) a settlement proposal was made; and (2) Allen was conducting negotiations under the impression that the group vested Ernest with authority as the final decisionmaker. From the time this letter was sent until Allen signed the Agreement on April 21, no member of the Ernest Group contacted Allen to inform him that anything more than Ernest's consent was required to create a binding settlement agreement.

On April 10 and 11, Allen met with Ernest in California. Using a one-page summary as reference, Allen spent many hours discussing the settlement proposal with Ernest. Jeanne, who was in Lake Tahoe at the time, told Allen over the telephone: "I know you and Ernie are going to do what's best." Record at 551. Ivan was not present during the discussions because he was not feeling well, but told Allen over the telephone: "Dad's handling it." Record at 551.

2. On May 10, 1990, Lafayette Bank and Trust filed a Verified Complaint to Contest Will against Elva Randle in the Carroll Circuit Court. On June 21, 1990, this case was venued to White County. On November 20, 1990, this action was venued to Cass Circuit Court, where it was assigned Cause No. 09C01–9011–CP–286. On June 7, 1990, the case of Elva Randle, Executrix of the Estate of Edna Sager, was filed in the Tippecanoe Circuit Court. On June 27, 1990, this case was venued to White County. On April 14, it was transferred to Cass Circuit Court and consolidated with Cause No. 09C01–9011–CP–286.

Allen testified Ernest authorized him to propose the division of land contained in the final Agreement on April 14. Allen faxed opposing counsel on April 14, stating "Ernie contacted me this afternoon and indicated he was willing to settle this case on the basis of the conveyance to him or his designates of those tracts of real estate which I have filled in on the attached exhibit.... My expectation is that this is the final authority on settlement I will have from Ernie Scott." Record at 264. Although Ivan sent Allen a letter on April 14 voicing some concerns regarding the land division, Allen spoke with Ivan on April 15 by telephone, and addressed the concerns contained in the letter.

On April 18, Allen sent a letter to Ernest, Ivan and Janet by next day air informing them that a settlement agreement had been reached. The letter included a summary of the settlement agreement, along with his opinion of the success of the negotiations:

> "There are very few cases that I have handled where I can state that we have been able to reach a settlement that will result in my clients receiving more by way of settlement that they would have received had they fully prevailed at trial. This is an unusual circumstance because if we had prevailed at trial, Ralph would have been entitled to a substantial part of the estate assets. In other words, Elva is taking Ralph's assets now and the three of you are left with more than what you would have received had we won at trial. For the information of all of you, I have enclosed the analysis page that I made and discussed with Ernie when I visited him in California." Record at 270.

On Wednesday, April 20, Allen faxed Ernest a copy of the settlement agreement along with a letter stating that the court informed him that they needed to signify their approval of the agreement by Thursday morning. On April 20, Ernest faxed Allen expressing his extreme antithesis toward McGlone and Emerson, but the letter did not state that he was refusing to settle the case:

> "You know me if any way I can get even with McGlone when this is over I will. Also any way I can cause McGlone and Emerson with problems to get paid for

what they do. I want to make them do more work to cost Elva and Ralph more money or in plain words make Elva and Ralph pay more to their lawyer as well make them work for what they get." Record at 374.

Allen testified that on Thursday morning, April 21, after a lengthy phone conversation with Ernest, he received authorization to enter into an agreement based on the terms contained in April 20 offer. Ernest suggested some relatively minor changes be made to the final settlement agreement. Allen then informed opposing counsel by fax of the requested changes. Later that day, Allen again faxed opposing counsel, stating that, based upon their insistence that it was time to settle the case, he had "further conferred" with his clients and obtained authority to revise two of Ernest's proposed changes regarding a drainage issue and the removal of Donald Smith as co-executor. Allen signed the final settlement agreement at 4:27 p.m. on April 21. However, before he signed the Agreement, Allen did not obtain the consent of each individual member of the Ernest Group. On April 22, a motion to remove the cause from the trial calendar was filed with the trial court. The signed settlement papers were to be submitted within thirty days.

On April 22, Allen sent Ernest a letter by next day mail, advising him that he executed the Agreement and faxed it to the court. He informed Ernest that he was able to include the changes regarding the co-executor issue, but that it was impossible to include all the requested language regarding the drainage issue. He assured Ernest that the drainage issue could be resolved outside the case if necessary. He also informed Ernest that he was not able to include Ernest's requested change in regard to the division of proceeds for the 1993 crops.

On May 6, by next day mail, Allen tendered the final draft of the Agreement to Ernest for his signature. The letter accompanying the final draft acknowledged that Allen received a number of letters from Ernest questioning certain provisions of the Agreement. Despite these concerns, Allen felt the group was committed and, therefore,

must sign the Agreement. Allen offered to discuss the settlement further with Ernest.

Ernest, responded by fax on May 9, stated: "I am not bound by anything until I sign it or give someone permission to sign for me. I sure appreciate what you do for me and how we do business for each other. Hope you understand why I won't sign this." Record at 376. On May 12, Ernest and Jeanne signed the consent to discharge Donald R. Smith as executor, which was one of the negotiated terms of the final settlement agreement. On May 16, Ivan and Janet also signed the consent to discharge.

On May 27, Allen notified Ernest that the Agreement had not been filed within the thirty-day time frame, and that they needed to get together as soon as possible. He asked Ernest to let him know when they could meet, or, in the alternative, to sign the Agreement and forward it as soon as possible. On June 1, Ernest responded:

"We have a serious communication problem here. I can't return to Indiana for approximately 2 weeks. How can I convince you that I can not and will not sign the so called settlement agreement as presented to us?!! Please carefully compare that with the proposed agreement that I reviewed in Calif with you. Why should I continue to be pressured to sign an unacceptable Settlement Agreement full of loopholes. I need to hear from you as soon as possible." Record at 1333.

A petition to enforce the Settlement Agreement was filed by Elva and Ralph on August 5, 1994. In August, after the petition was filed, Allen met with Ernest and Ivan to discuss once again the Agreement and urge them to sign. After roughly ninety minutes, Ernest still refused to sign, although Allen was unable to discern exactly why.

The case proceeded to trial in order to determine whether the parties were bound by the Agreement. Neither party requested special findings on the question of the enforcement of the settlement agreement. Evidence was heard on February 23, July 13, August 14, September 5, September 12 and October 6, 1995. On June 12, 1995, Elva and Ralph filed a motion for attorney fees and expenses, along with a motion for a bifurcat-

ed hearing regarding that issue. The court set a separate hearing date on the matter of attorney fees.

The trial court ruled on June 13, 1996 that the Agreement was binding. The trial court entered the following findings:

"8. From the earliest days of the cause represented by this consolidated action, Ernest L. Scott, Ivan Scott, Jeanne Scott and Janet Oberlander, were represented by the firm of Brand & Allen ... Not once was there objection raised as to the adequacy of their representation or the manner of communication with them in the three years and ten months that this cause worked its way through the dockets of courts in four counties before reaching settlement on the eve of trial.

9. Attorney Allen, with the agreement or acquiescence of Ernest L. Scott's wife, Jeanne Scott, and the two children who chose to support their father against the position taken by their brother, Ralph L. Scott and their father's sister, Elva Randle, generally communicated with all of his named clients through Ernest L. Scott, the patriarch and family spokesman. ·

10. Attorney Allen exercised statutory authority [ ] when he negotiated terms of the Settlement Agreement which was filed with the Court on April 22, 1994, and evidence revealed during the course of hearing on the Motion to Approve and Enforce Settlement Agreement clearly establishes both actual and apparent authority to represent his party-clients in the negotiation and settlement of the issues in this cause." Record at 161.

In its order, the court also directed counsel to make written submission in the matter of attorney fees. Both sides filed their submissions by August 26, 1996. On October 4, 1996, the trial court took the issue of attorneys fees under advisement pending the determination of this court regarding the Agreement.

The judicial policy of Indiana strongly favors settlement agreements. *Klebes v. Forest Lake Corp.* (1993) Ind.App., 607 N.E.2d 978, 982, *trans. denied.* Settle-

ments allow our courts to operate more efficiently and, equally important, allow the parties to fashion the outcome of their disputes through mutual agreement. *Natare Corp. v. Aquatic Renovation Systems Inc.* (1997) S.D.Ind., 987 F.Supp. 695. If a party agrees to settle a pending action, but then refuses to consummate the settlement agreement, the opposing party may obtain judgment enforcing the agreement from the court before which action is pending. *Klebes, supra* at 982.

In this case, the trial court found the parties entered into a binding settlement agreement, in part, because Allen had actual and apparent authority to represent his party-clients in the negotiation and settlement of their case. The Ernest Group argues that the Agreement is unenforceable because Allen failed to obtain the consent of all parties prior to execution. However, analysis of the case law regarding the scope of an attorney's actual or apparent authority to execute binding settlement agreements leads this court to conclude that Allen had both actual and apparent authority to negotiate a binding agreement.

## ACTUAL AND APPARENT AUTHORITY

■ Actual authority is created by written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account. *Drake v. Maid–Rite Co.* (1997) Ind. App., 681 N.E.2d 734, 737 (citing Restatement (Second) of Agency § 26 (1958)), *reh'g denied.* The focus of actual authority is the belief of the agent. *Id.* The authority may be express or implied and may be created by acquiescence.

■ *Koval v. Simon Telelect, Inc., supra,* expressed the overall concept thusly: "The attorney must have either express, implied, or apparent authority, or must act according to the attorney's inherent agency power." 693 N.E.2d at 1301. The principle of inherent agency power is not relevant to the matter before us because, as noted in *Koval,* that doctrine concerns attorneys' actions with respect to "a procedure in court." The *Koval* court analogized ADR mediation to a "proce-

dure in court" and held that "in the absence of a communication of lack of authority by the attorney, as a matter of law, an attorney has the inherent power to settle a claim when the attorney attends a settlement procedure governed by the ADR rules." 693 N.E.2d at 1301.

■ Allen was the sole representative for each member of the Ernest Group in this litigation from June 1990 until August 1994. Allen presented evidence that Ivan, Janet and Jeanne deferred to Ernest when it came to major decisions. On April 7, Allen wrote each member personally informing them he had a settlement proposal, and clearly indicated his position that the rest of the group was deferring to Ernest on major decisions. While Ivan, Janet and Jeanne were each aware that Allen was engaged in settlement negotiations on their behalf, at no time did they express any type of disagreement or discomfort with Allen's understanding that Ernest could and would make the decision regarding final settlement terms.

Allen traveled to California and discussed the settlement proposal at length with Ernest on April 10 and 11. On April 14, Allen received authority from Ernest to propose the land division contained in the final agreement. On April 18, Allen sent a letter by next day mail, addressed to Ernest, Ivan and Janet, informing them a settlement had been reached and summarizing the terms of the agreement. Allen received no indication from Ivan, Janet, or Jeanne that they were uncomfortable with the terms, or that a final settlement could not be reached without their individual consent.

On April 20, Allen faxed Ernest a copy of the final settlement draft. Ernest was aware that the parties needed to file an agreement by April 21 or the case would proceed to trial. On April 21, Allen discussed the final settlement draft with Ernest and testified that after this conversation he received authority to finalize the settlement.

As these facts indicate, there was sufficient evidence from which the trial court could reasonably conclude that Allen justifiably believed he had authority to enter into a binding agreement on April 21. The record

reflects that the group's decisionmaker, Ernest, was presented with a draft of the final settlement terms and given the opportunity to accept or reject the proposal. Allen testified Ernest authorized him to enter into the Agreement, and Ivan, Janet and Jeanne implicitly consented to the Agreement through their acquiescence to Ernest's role as final decision-maker. Accordingly, Allen had actual authority to create a binding settlement agreement.

 Allen also had apparent authority to finalize settlement negotiations. An attorney representing a party during litigation may have apparent authority to bind his client to a settlement agreement. *See Ferrara v. Genduso* (1938) 214 Ind. 99, 14 N.E.2d 580, 581; *Black v. Krauss* (1949) 119 Ind.App. 529, 85 N.E.2d 647, 651. An agent possesses apparent authority when a third person reasonably believes the agent possesses authority due to some act by the principal. *Pollas v. Hardware Wholesalers, Inc.* (1996) Ind.App., 663 N.E.2d 1188, 1191, *reh'g denied.* Placing an agent in a position to act and make representations which appear reasonable is sufficient to endow him with apparent authority. *Id.* A communication of authority made solely by the agent is inadequate. *Koval v. Telelect, Inc., supra.* However, when a party places an agent in the position of sole negotiator on his behalf, it may be reasonable for the third person to believe that the agent possesses authority to act for the principal. In such instance, the conduct of the principal constitutes the requisite manifestation or communication, although indirect. *See Pepkowski v. Life of Indiana Ins. Co.* (1989) Ind., 535 N.E.2d 1164.

 Allen entered his appearance for each member of the Ernest Group in the litigation. Each member of the Ernest Group was fully aware and supportive of Allen's attempt to negotiate a final settlement on their behalf. As such, the Ernest Group placed Allen in a position such that counsel for Elva and Ralph reasonably believed he possessed authority to act on their behalf. Therefore, Allen had apparent authority to execute a binding settlement agreement.

### CONSENT

 Indiana case law is consistent with the proposition that an attorney's actual or apparent authority to enter into binding settlement agreements may, in some instances, operate as a type of functional consent to the agreement's terms.

In *Klebes, supra,* 607 N.E.2d at 982, this court stated:

"Although a client has full authority over the decision whether to settle the case or proceed to trial, Ind. Professional Conduct Rule 1.2, attorneys act as agents of their clients and may enter enforceable settlement agreements on their behalf if they first secure their client's consent to do so.

It is well-settled that in the absence of fraud or mistake a settlement is as binding and conclusive of the parties' rights and obligations as a judgment on the merits." *Id.* (Citations omitted).[3]

In *Klebes,* an attorney received a settlement offer on June 4, 1991. The attorney testified at the enforcement hearing that his clients authorized him to settle the case on those terms. The attorney memorialized this authorization in a June 4 letter to his clients. The clients maintained that they only accepted the offer based upon the stipulation that the agreement also include other provisions. In finding that the parties reached a binding settlement agreement, the court noted that the question of whether clients authorized their attorney to settle is a matter of witness credibility to be decided by the trial court:

"Although the Klebeses testified as to their intent, the trial court was not required to accept their testimony as credible.... Although the Klebeses invite us to assess

---

3. In certifying the question answered by our Supreme Court, Federal District Judge Robert Miller of the Northern District of Indiana, in *Koval v. Simon–Telelect, Inc.,* (N.D.Ind.1997) 979 F.Supp. 1222, 1229, was of the view that *Klebes* signaled "a retreat from the historic breadth of an attorney's agency ... [but that] [w]hether the clients consented to settlement negotiations was not an issue in the case, so the suggested limitation on the attorney's authority to settle a claim can only be considered *dicta.*"

witness credibility by accepting their position, and thus disregard Harrington's testimony, we decline this invitation and remind the Klebeses that determination of witness testimony is a matter reserved for the trial court." *Id.* at 983.

██ Our case is similar to *Klebes* in that, after hearing all the testimony, the trial court chose to accept the evidence that Allen had authority to enter into a binding settlement. The evidence relied upon by the trial court was sufficient to support its finding that Allen had actual and apparent authority to execute the Agreement.

We acknowledge that *Klebes* is somewhat distinguishable because Allen, unlike the attorney in *Klebes,* did not contact each client to obtain his or her consent before accepting the settlement offer. However, we see no reason why an individual such as Ernest, who was acting as the spokesperson and final decision-maker for a small, close-knit client group, could not authorize that group's attorney to enter into a binding agreement.[4]

The Ernest Group argues that *Klebes* is inapplicable because the attorney in that action memorialized the clients' authorization to settle on specific terms in a letter. We find that argument unpersuasive because: (1) the Klebes family claimed they conditioned their consent on provisions not contained in the letter; and (2) the attorney had already made the settlement offer, thereafter accepted, before writing the letter.

Next, the Ernest group asserts that *Gravens v. Auto–Owners Ins. Co.,* (1996) Ind. App., 666 N.E.2d 964, *trans. denied,* supports their position that an attorney must obtain the consent of each client before he may enter into a binding settlement agreement. We disagree. Gravens held that:

4. The Ernest Group contends the trial court erred by resolving the question of consent based on its finding that Ernest was the patriarch and family spokesman. In support of their position that the law requires consent by individual group members, they cite Ind. Professional Conduct Rule 1.8(g), which states: "A lawyer who represents two or more clients shall not participate in making an aggregate settlement of the claims of the clients unless each client consents after disclosure." However, the Ernest Group provides no legal authority to support their position that

"[T]he requirement that an attorney must obtain his client's authority or consent to settle a case is implicit in the client's right to exercise ultimate authority over the settlement of a case as guaranteed by Prof. Cond.R. 1.2(a). Moreover, the rule that an attorney does not have authority to compromise an action merely by virtue of the attorney-client relationship is essentially universal." *Id.* at 966.

██ *Gravens* states that either client authority or consent may be sufficient to settle a case. Therefore, *Gravens* does not require that an attorney have *both* his client's authority and consent before he executes a binding settlement agreement. Under the standard in *Gravens,* enforceable settlement agreements may be possible when a client intelligently authorizes his or her attorney to negotiate a final deal, but does not literally consent to all the final negotiated terms. For example, if a client instructs his attorney to settle a case within certain parameters, and the attorney settles the case pursuant to those instructions, the agreement would not be unenforceable merely because the client had not "consented" to the final negotiated terms. Having said this, it is clear that the attorney-client relationship alone, without some additional indicia of client authorization, is not enough to create a binding settlement agreement.[5] This is the clear holding of *Koval v. Simon Telelect, Inc., supra.* We are not unaware of the holding of a different panel of this court in *Red Arrow Ventures, Ltd. v. Miller,* (1998) Ind.App., 692 N.E.2d 939. The court there rejected both *Klebes* and *Gravens* and held that "when an attorney enters into a settlement agreement without his client's consent, the agreement is enforceable against the non-consenting client." *Red Arrow,* 692 N.E.2d at 946. We

individual group members cannot communicate their consent through a unanimously agreed upon spokesperson and final decision-maker, and we have been unable to discover any such authority.

5. Today's decision should in no way imply that an enforceable settlement agreement may be created by an attorney who tenders or accepts settlement offers without client consultation or in direct contravention of his client's instructions.

do not read *Red Arrow* to require enforcement of a settlement agreement entered into without either consent *or* apparent or actual authority. To the extent, however, that the case is susceptible to that construction, or to the extent that it would hold the mere creation of an attorney-client relationship requires enforcement of a settlement agreement wholly initiated and created by the attorney, without any knowledge on the part of the client, it has been overruled by *Koval, supra.*

The Ernest Group's reliance on *Gravens* is also misplaced because the attorney in *Gravens* clearly acted without actual or apparent authority. The attorney had no actual authority because he accepted an offer from Gravens' insurance carrier without ever informing the client an offer had been made. He had no apparent authority because the insurance company knew that the attorney could not settle the case without also obtaining the client's signature on the release form.

The decision in *Gravens* is not inconsistent with the decision in *Klebes.*[6] The settlement was unenforceable in *Gravens* because there was no evidence that the attorney had client authority or consent to settle. The agreement was enforceable in *Klebes* because there was sufficient evidence that the attorney had both client authority and consent to settle, and the trial court merely chose which version of the facts it deemed more credible.

The settlement agreement is enforceable because Allen had actual and apparent authority from his client to enter into a binding settlement agreement. While the Ernest Group may be dissatisfied with the results of the negotiations, mere dissatisfaction does not mandate setting aside legitimate settlement agreements.

## ABSENCE OF FINDINGS— ATTORNEY FEES

The Ernest Group's argument that the trial court erred because it failed to include a requested finding regarding attorney fees is without merit. The trial court bifurcated the issue of attorney fees, and in its order enforcing the settlement, requested parties make written submissions upon that issue. Both sides have filed their submissions and the court has simply yet to rule on the matter.

## ATTORNEY TESTIMONY

As to the issue regarding attorney trial testimony, the Ernest group presents no evidence of prejudice resulting from McGlone or Traylor's testimony. At the hearing to enforce the Agreement, Traylor, who represented Lafayette Bank and Trust Company, and McGlone, who represented Elva and Ralph, were both permitted to testify. However, any allegation of error asserted by the Ernest Group regarding the admission of their testimony fails because error unaccompanied by prejudice is not grounds for reversal. *Homehealth, Inc. v. Northern Indiana Public Service Co.* (1992) Ind.App., 600 N.E.2d 970, *reh'g denied.*

## FRIVOLOUS APPEAL CONTENTION

Finally, Elva, Ralph and Lafayette Bank and Trust Company request that this court enter an award of damages, including attorney fees, under Ind. Appellate Rule 15(G). The rule allows for damages when an appeal is "permeated with meritlessness, bad faith, frivolity, harassment, vexatiousness, or purpose of delay." *Orr v. Turco Manufacturing Co., Inc.* (1987) Ind., 512 N.E.2d 151, 152. However, in exercising its discretionary power to award damages for a frivolous appeal, the Court of Appeals uses extreme re-

---

**6.** Judge Miller in *Koval v. Simon–Telelect, Inc.,* supra, concluded otherwise, being of the view that *Gravens* not only "appears to be diametrically inconsistent with the [prior] cases, ... but ... also expressed unawareness of those cases...". 979 F.Supp. at 1231. In *Natare Corp. v. Aquatic Renovation Systems Inc., supra,* Judge Barker of the Southern District of Indiana reached a similar conclusion stating: "*Gravens* ... cast doubt on Indiana's long-standing doctrine that an attorney has authority to bind the client to a settle-

ment without the client's consent ...". 987 F.Supp. at 698. However, because we conclude that the Ernest Group authorized the settlement agreement, and that *Gravens* may be reconciled with *Klebes,* our decision should not be reasonably construed to adopt a sweeping rule stating that without regard to actual or apparent authority, any attorney who is retained may enter into a binding settlement agreement without his client's consent. Again, our Supreme Court in *Koval, supra,* precludes such a holding.

straint. *Yin v. Society Nat. Bank Indiana* (1996) Ind.App., 665 N.E.2d 58, 65, *trans. denied.*

The question of whether or not an attorney representing multiple clients in settlement negotiations may enter into a binding settlement agreement without first obtaining each client's final consent was a valid appealable issue. The request for damages and appellate attorney fees is denied.

We affirm the trial court's decision enforcing the Agreement.

FRIEDLANDER and KIRSCH, JJ., concur.