

FILED

May 31 2016, 9:54 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANTS

Sandy L. Bryant
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES

Fred Pfenninger
Pfenninger & Associates
Indianapolis, Indiana

# I N  T H E
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Faye E. Warfield and Keyotta Warfield a/k/a Nicole Warfield, | May 31, 2016 |
| *Appellants-Defendants,* | Court of Appeals Case No. 49A02-1503-PL-164 |
| v. | Appeal from the Marion Superior Court |
| Jim Dorey d/b/a JRD Construction Services and JRD Enterprises, LLC, | The Honorable Robert R. Altice, Judge |
| *Appellees-Plaintiffs.* | Trial Court Cause No. 49D05-1310-PL-37241 |

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellants-Defendants/Counterclaim Plaintiffs, Faye E. Warfield (Faye) and Keyotta Warfield A/K/A Nicole Warfield (Keyotta) (collectively, the Warfields), appeal the trial court's Judgment in favor of Appellee-Plaintiff/Counterclaim Defendant, Jim Dorey D/B/A JRD Construction Services and JRD Enterprises, LLC (Dorey), on Dorey's breach of contract claim and unjust enrichment allegation.[1]

We reverse and remand.

## ISSUE

The Warfields raise six issues on appeal, which we consolidate and restate as the following single issue: Whether the contract between Faye and Dorey is void under the Home Improvement Contracts Act (HICA).

## FACTS AND PROCEDURAL HISTORY

In 2012, Faye, Faye's daughter Keyotta, and Keyotta's husband and daughter lived together in Faye's residence, located in Indianapolis, Indiana. When the house sustained hail damage to the roof, Faye filed a claim against her home owner's insurance policy with Liberty Mutual Insurance Company (Liberty Mutual) to pay for the damage to the roof. Eric Albright (Albright), a Liberty

---

[1] We held oral argument in this case on April 28, 2016, at Wabash College, in Crawfordsville, Indiana. We thank the College for its hospitality and counsel for their advocacy.

Mutual adjuster, requested Dorey to contact the Warfields about the roof damage. Dorey was an independent insurance adjuster and had worked with insurance companies for many years. Dorey applied for a general contractor's license on December 12, 2012, which he received on March 1, 2013. As part of the licensing application, Dorey provided evidence that he was bonded and insured. At the time of Albright's phone call, Dorey was on Liberty Mutual's list of preferred contractors. Albright instructed Dorey to contact Faye's daughter, Keyotta, because Faye "was older and [Keyotta] was going to represent her." (Transcript p. 34).

On December 16, 2012, Dorey met with Keyotta and Keyotta's husband at Faye's residence. Faye was not present. Keyotta texted her mother that Dorey had arrived but Faye "said she could not get there right now and [Keyotta] could get the information." (Tr. p. 176). During the meeting, Keyotta and Dorey discussed the work to be performed, and they picked out the colors for the shingles and the gutters. Dorey presented Keyotta with the roofing contract (Contract) from JRD Construction Services,[2] owned by Dorey. The Contract identified Faye as the customer, specified the roofing work to be done and

---

[2] Dorey started JRD Enterprise, LLC, a remodeling business, in February of 2006 and the business expanded to roofing work in 2013. JRD Enterprise is an "S-Corporation and that's filed with the Secretary of State." (Tr. p. 29). JRD Construction Services is the name used "to show people that we do – we don't just do one thing, we do a combination of different things." (Tr. p. 29). As such, "JRD Construction Services and JRD Roofing are not separate legal entities," rather, the "wording [is] used for advertising purposes." (Tr. p. 29).

materials to be used, the price for the work, and was signed by Keyotta and Dorey. Keyotta provided Faye with a copy of the Contract later that day.

[6] Keyotta also mentioned that the fireplace was in bad condition and inquired about rebuilding it. Dorey informed her that he could do the work but that rebuilding the fireplace would have to be completed prior to the roof work as otherwise the new shingles could be damaged. He explained that while Liberty Mutual would pay for the roofing work, the work on the fireplace would not be covered by the insurance company and would have to be paid for separately. Keyotta verbally agreed to pay the price for the fireplace rebuild. Subsequent to the meeting, Dorey dropped off brick samples for the work on the fireplace and Keyotta picked out a color. Dorey added the fireplace rebuild to the Contract, but did not ask Keyotta to initial or sign the Contract modification. Keyotta later confirmed that Faye was "fine" with the chosen colors for the shingles and gutters. (Tr. p. 182).

[7] Because of bad weather, Dorey did not commence the roofing work until July of 2013. He did not obtain a permit for the work, but did provide a notification to be posted on the Warfields' front door. While tearing off the old shingles, Dorey discovered that the decking on the roof was in bad shape and needed to be replaced. After contacting Liberty Mutual, the insurance company authorized the replacement of the decking. Again, Dorey added the additional work to the Contract but did not ask Keyotta to initial or sign the addition.

[8] At the end of a job, Dorey typically meets with the customer to finalize the contract and to endorse any checks from the insurance company, if needed. Despite Dorey's attempts to schedule a meeting, the Warfields did not meet with him, nor did they notify him about any defective work that needed to be cured. Although Liberty Mutual paid for the work with checks made out to Faye, Faye never endorsed the checks nor did the Warfields pay for any of the work to the roof or fireplace.

[9] On October 4, 2013, Dorey filed his Complaint, asserting breach of contract and unjust enrichment. The Warfields filed a *pro se* Answer. On December 31, 2013, Dorey filed a motion for summary judgment, designation of evidence, and memorandum in support of his motion. On March 13, 2014, the trial court conducted a hearing on Dorey's motion for summary judgment and subsequently granted the motion the following day. On April 10, 2014, the Warfields filed a notice of appeal with the Indiana court of appeals. Four days later, the Warfields, represented by counsel, filed a motion to correct error, contending that Dorey had failed to provide the trial court with a contract signed by Nicole Warfield or Faye Warfield. On May 28, 2014, during the hearing on the Warfields' motion to correct error, it was established that Faye's daughter is legally known as Keyotta Nicole Warfield. The trial court denied the motion to correct error.

[10] Nonetheless, on July 23, 2014, the trial court vacated the summary judgment and granted Dorey ten days to amend his Complaint. Dorey timely filed an Amended Complaint and the Warfields subsequently dismissed their appeal.

On October 20, 2014, the Warfields filed their Answer and Counterclaims, alleging various violations of Indiana's HICA and asserting that Dorey's lawsuit was frivolous. On January 29, 2015, the trial court conducted a bench trial and entered judgment in favor of Dorey on February 19, 2015, concluding in pertinent part:

> The [c]ourt finds for [Dorey] on his [b]reach of [c]ontract claim.
>
> The [c]ourt finds that [Keyotta] was acting as an agent on behalf of [Faye]. . . .
>
> It is clear from the testimony that the parties['] intent was to increase the scope of the contract by replacing the decking and rebuilding the fireplace. The contract does not contain a provision requiring modifications to be in writing and signed by the parties. These two (2) modifications amended the parties['] contract by increasing the scope of work and the cost associated with the contract. . . .
>
> While the [c]ourt is aware that there are some deficiencies in the signed contract in this case; that written notice of the right to cancel was not provided (although there are some cancellation provisions in the [C]ontract); and that [Dorey] may not have obtained the proper permits (although he did post a "notification" on the Warfields' door); [the Warfields] certainly received the benefits of [Dorey's] services. They received a new roof with new decking and a rebuilt fireplace. [The Warfields] never made any complaints regarding the condition of the work. In fact, both of the Warfields testified that they still have no complaints about the workmanship. To void the contract would be unequitable at this point in time. [The Warfields] have not been damaged by any failures of [Dorey] to comply with any of the provisions of the [HICA].

(Appellants' App. pp. 65-67).

The Warfields now appeal. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Standard of Review*

In entering its judgment in favor of Dorey, the trial court issued findings of fact and conclusions of law. When the trial court issues findings of fact and conclusions thereon, we employ a two-tiered standard of review. *Cyr v. J. Yoder, Inc.*, 762 N.E.2d 148, 149-50 (Ind. Ct. App. 2002). We first determine whether the evidence supports the findings and then we determine whether the findings support the judgment. *Id.* at 150. We will not disturb the trial court's findings or judgment unless they are clearly erroneous. *Infinity Prods., Inc. v. Quandt*, 810 N.E.2d 1028, 1031 (Ind. 2004). We will consider only the evidence favorable to the findings and judgment and all reasonable inferences drawn therefrom. *Id.* We will not reweigh the evidence or assess the credibility of the witnesses. *Id.* at 1032. Questions of law will be reviewed under a *de novo* standard. *Hayes v. Chapman*, 894 N.E.2d 1047, 1052 (Ind. Ct. App. 2008).

### II. *Analysis*

#### 1. Home Improvement Contracts Act

In essence, the Warfields contend that the Contract with Dorey is void as it failed to comply with several requirements of the HICA. They maintain that

the Contract failed to include a start and end date for the work; Faye, as consumer, did not sign the Contract; and Dorey's business address is not included. In addition to these missing requirements, the Warfields also contend that Dorey did not have a contractor's license, did not pull the required permits, and unilaterally altered the Contract by annotating it with the work on the fireplace and the decking on the roof. Dorey does not dispute that the Contract failed to strictly comply with the HICA.

[14] Initially, we note that, when interpreting statutes, "[c]ourts must consider the goals of the statute and the reasons and policy underlying the statute's enactment." *Bowyer v. Ind. Dep't. of Natural Res.*, 944 N.E.2d 972, 988 (Ind. Ct. App. 2011), *reh'g denied*. Additionally, we must consider the effects of our interpretation. *Kitchell v. Franklin*, 997 N.E.2d 1020, 1026 (Ind. 2013). We have previously observed that the purpose of HICA

> is to protect consumers by placing specific minimum requirements on the contracts of home improvement contracts . . . [because] few consumers are knowledgeable about the home improvement industry or of the techniques that must be employed to produce a sound structure. The consumer's reliance on the contractor coupled with well-known abuses found in the home improvement industry, served as an impetus for the passage of [HICA], and contractors are therefore held to a strict standard.

*Hayes v. Chapman*, 894 N.E.2d 1047, 1052 (Ind. Ct. App. 2008) (quoting *Benge v. Miller*, 855 N.E.2d 716, 720 (Ind. Ct. App. 2006)), *trans. denied*. HICA therefore

requires home improvement suppliers[3] performing any alteration, repair, or modification to the residential property of a consumer[4] for an amount greater than $150 to provide the consumer with a written home improvement contract, containing the nine elements listed in I.C. § 24-5-11-10. *See* I.C. §§ 24-5-11-1; -3; -4; -10(a).

[15] Violations of HICA are labeled "deceptive acts" and are actionable by the attorney general or by the consumer. I.C. § 24-5-11-14. The Act provides victims of deceptive acts with the same remedies and penalties granted to victims of deceptive consumer sales under the Indiana Deceptive Consumer Sales Act (DCSA). I.C. § 24-5-11-14. Specifically, "[a] person relying upon an uncured or incurable deceptive act may bring an action for the damages actually suffered as a consumer as a result of the deceptive act or five hundred dollars ($500), whichever is greater." I.C. § 24-5-0.5-4(a). An "uncured deceptive act" means a deceptive act of which the consumer gave proper notice to the supplier and either the supplier made no offer to cure within thirty days of the notice or the act was not cured within a reasonable time. I.C. § 24-5-0.5-2(a)(7). An "incurable deceptive act" means "a deceptive act done by a supplier as part of a

---

[3] A "home improvement supplier" is a "person who engages in or solicits home improvement contracts[.]" I.C. § 24-5-11-6. The parties do not dispute that Dorey is a home improvement supplier subject to HICA.

[4] A "consumer" for purposes of HICA is an individual who owns, leases, or rents the residential property that is subject of a home improvement contract. I.C. § 24-5-11-2. The parties do not dispute that Faye is a consumer under HICA.

scheme, artifice, or device with intent to defraud or mislead." I.C. § 24-5-0.5-2(a)(8).

[16] Thus, to establish entitlement to the remedies under HICA, the consumer must show that the deceptive act was either uncured—meaning that notice was given and the deceptive act was not cured—or incurable—meaning that the supplier acted with an intent to defraud or mislead the consumer. I.C. § 24-5-0.5-4(a). The Warfields do not contest that they failed to provide notice; nonetheless, they posit that because Dorey failed to strictly comply with HICA, the trial court was required to void the Contract.

[17] HICA does not include a provision mandating that contracts violating HICA's requirements be declared void. *See Imperial Restoration & Remodeling, Inc. v. Costello*, 965 N.E.2d 723, 728 (Ind. Ct. App. 2012) ("[B]ecause we value freedom of contract so highly," we will not void a contract for contravening a statute unless the statute dictates unambiguously that such contravention renders a contract void.). Rather, HICA creates a cause of action for which voiding the contract is one possible remedy. *Id*. at 729; I.C. § 24-5-0.5-4(d) ("[T]he court *may* void or limit the application of contracts or clauses resulting from deceptive acts and order restitution to be paid to aggrieved customers.") (emphasis added). We have previously elaborated:

> We must [] conclude from . . . the legislature's failure to use words like "void" or "voidable" in HICA to describe contracts made in violation thereof, as well as the inclusion of remedial provisions to be invoked in the event of a violation, one of which is voiding the contract, that the General Assembly did not intend

[] every contract made in violation of HICA to automatically be void.

*Id*. Thus, the statute leaves it to the trial court to determine whether voiding the contract is an appropriate remedy.

In making this decision, the trial court must apply a balancing approach and examine certain factors to determine if the contract violates public policy. *Paul v. Stone Artisans, Ltd.*, 20 N.E.3d 883, 888 (Ind. Ct. App. 2014). The court should consider (1) the nature of the subject matter of the contract, (2) the strength of the public policy underlying the statute, (3) the likelihood that refusal to enforce the bargain or term will further that policy, (4) how serious or deserved the forfeiture suffered by the party attempting to enforce the bargain would be, and (5) the parties' relative bargaining power and freedom to contract. *Id*.

On December 16, 2012, Dorey and Keyotta signed the Contract for roofing work on Faye's residence. Our review of the document reveals several violations with HICA's requirements. Besides an internet link and a telephone number, the Contract does not include the "address of the home improvement supplier." I.C. § 24-5-11-10(a)(2). It fails to specify the "approximate starting and completion dates of the home improvements." I.C. § 24-5-11-10(a)(6). The Contract also does not provide signature lines "with a legible printed or typed version of that person's name placed directly after or below the signature." I.C. § 24-5-11-10(a)(9). In addition to lacking these requirements, the Contract fails to include the "notice of cancellation." I.C. § 24-5-11-10(c)(6). While Faye is

identified as the consumer of the Contract, she never signed the document. I.C. § 24-5-11-4. Instead, Faye's daughter, Keyotta, signed the contract as Faye's agent, without identifying herself as such.[5]

[20] HICA mandates that "[w]here a license or permit is necessary for any part of a home improvement, the home improvement contract shall be subject to obtaining the necessary licenses or permits prior to any work commencing." I.C. § 24-5-11-9. Specifically, "[a] supplier commits a deceptive act if the supplier . . . solicits to engage in a consumer transaction without a permit or other license[.]" I.C. § 24-5-0.5-10. At trial, Sarah Pastor (Pastor), licensing supervisor with the department of code enforcement at the City of Indianapolis, testified that to perform the work, Dorey "must be a listed contractor." (Transcript p. 110). The evidence reflects that Dorey filed his application to become a licensed contractor on December 12, 2012, and received his contractor's license on March 1, 2013. Accordingly, even though Dorey was a licensed contractor at the time the roofing work commenced on July 13, 2013, he was yet to be approved as a licensed contractor in Marion County at the time he solicited Faye's business. Furthermore, while the decking work required a

---

[5] Although not a determinative issue, we find that Keyotta acted as Faye's agent during the Contract negotiations and thereafter. Here, all communications to Dorey were made by Keyotta, and not by the principal, Faye. When a party places an agent in the position of sole negotiator on his or her behalf, it may be reasonable for the third person to believe that the agent possesses authority to act for the principal. *Scott v. Randle*, 697 N.E.2d 66, 67 (Ind. Ct. App. 1998), *trans. denied*. Keyotta's sole negotiating position in the transaction between Faye and Dorey resulted in an indirect manifestation by Faye which could reasonably be relied upon by Dorey. Even if Keyotta acted as an unauthorized agent, we have also previously held that "[w]hen a principal, with full knowledge of the facts, appropriates the fruits of an agent's unauthorized act, the principal may not complain later that the agent acted without authority." *Blairex Laboratories, Inc. v. Clobes*, 599 N.E.2d 233, 236 (Ind. Ct. App. 1992), *trans. denied*.

permit, Dorey admitted to never having applied for one even though the permit requirement was listed in the "Gold Book"[6] which he received during the mandatory orientation class he attended prior to becoming licensed. (Tr. p. 104). Instead, Dorey merely provided Faye with a signed notification to be posted on her front door, stating

> I am a Contractor currently listed/licensed to perform the above mentioned construction activity in the Consolidated City of Indianapolis. I am submitting this notification indicating all work listed above will be accomplished in conformity to all building standards and procedures. I AFFIRM, UNDER PENALTIES FOR PERJURY, THAT THE FOREGOING REPRESENTATIONS ARE TRUE.

(Defendant's Exh. A). At trial, Dorey admitted that this was an untrue statement.

[21]  Because Dorey was yet to be licensed at the time he solicited the roofing work and failed to apply for the required permit, we conclude that he committed an incurable deceptive act as he intended to mislead Faye that he was a licensed contractor providing work in compliance with the statutory requirements and local ordinances. *See* I.C. § 24-5-0.5-2(a)(8). While we acknowledge that "the General Assembly did not intend that every contract made in violation of HICA to automatically be void;" the violation before us is precisely one of the

---

[6] The Gold Book "is the building standards and procedures of the consolidated City of Indianapolis." (Tr. p. 104).

"well-known abuses found in the home improvement industry" which the HICA intended to protect the consumer against. *Imperial Ins. Restoration & Remodeling, Inc. v. Costello*, 965 N.E.2d 723, 729 (Ind. Ct. App. 2013); *Benge*, 855 N.E.2d at 720. Therefore, we declare the Contract between Dorey and Faye void.[7, 8]

## 2. Quantum Meruit

[22] It is generally acknowledged that in the absence of an express contract, "a party may recover under the theory of unjust enrichment, or *quantum meruit*." *Troutwine Estates Dev. Co., LLC v. Comsub Design & Eng'g., Inc.*, 854 N.E.2d 890, 897 (Ind. Ct. App. 2006), *trans. denied*. To recover in *quantum meruit*, "the party must establish that a benefit was rendered to the other party at the express or implied request of that party, that allowing the other party to retain the benefit without paying for it would be unjust, and that the party seeking recovery expected payment for his services." *Mueller v. Karns*, 873 N.E.2d 652, 659 (Ind. Ct. App. 2007), *reh'g denied*.

[23] The evidence establishes that Dorey installed new decking, a new roof, and rebuilt the fireplace at Faye's request and without any complaints. Dorey expected payment for his work. Accordingly, Dorey is entitled to recover in

---

[7] Even if the Contract would not have been void, the decking and fireplace rebuild are not enforceable against Faye, as these modifications to the original Contract were not signed by the consumer. I.C. § 24-5-11-10(d).

[8] Because we declare the Contract void, Dorey is also no longer entitled to attorney fees.

*quantum meruit* as the home improvement work is a valuable benefit Faye would retain unjustly in the absence of making payment.

[24] In general, the measure of *quantum meruit* recovery is the "fair market value of services rendered," or the "reasonable value" thereof. *In Re Estate of Carroll*, 436 N.E.2d 864, 866 (Ind. Ct. App. 1982); *Mueller*, 873 N.E.2d at 659. We find the fair market value of the work performed by Dorey to be the amounts charged by the voided Contract and undisputed by Faye*, i.e.,* $8,548.68 for the roof, $3,677.10 for the decking, and $1,700.00 for the fireplace rebuild.

[25] Furthermore, an award of prejudgment interest may be proper when the underlying judgment rests on a theory of *quantum meruit* rather than the terms of a contract. *Troutwine*, 854 N.E.2d at 904. Such an award is warranted if the amount of the claim, like here, rests upon a simple calculation to be made, namely the addition of the amounts invoiced by Dorey. *See id*. Accordingly, we remand to the trial court with instructions to calculate the amount of prejudgment interest at eight percent per annum.

## CONCLUSION

[26] Based on the foregoing, we conclude that the trial court abused its discretion affirming the Contract between Faye and Dorey. Declaring the Contract void under HICA, we hold that Dorey can recover the invoiced amounts under the theory of *quantum meruit* and we remand to the trial court to calculate the prejudgment interest at eight percent per annum.

Reversed and remanded.

Kirsch, J. and Robb, J. concur