560 F.2d 765
 UNITED STATES of America for the use of Great Lakes Plumbing
& Heating Co., Plaintiff-Appellee,
v.
ORR CONSTRUCTION COMPANY, St. Arnaud Electric Company, Nager
Electric Company, Inc., and E. C. Ernst, Inc.,
Individually and d/b/a Orr and
Associates, a joint venture,
et al., Defendants-Appellants.
 No. 77-1414.
 United States Court of Appeals,
Seventh Circuit.
 Argued June 16, 1977.
Decided Aug. 10, 1977.
 
 Keith F. Bode, Chicago, Ill., Arthur S. Friedman, New York City, Jay A. Canel, Chicago, Ill, for defendants-appellants.
 Stephen Novack, Chicago, Ill., for plaintiff-appellee.
 Before SWYGERT and WOOD, Circuit Judges, and CAMPBELL, Senior District Judge.[1]
 SWYGERT, Circuit Judge.
 
 
 1
 The issue in this appeal is whether an agreement entered into by the parties to settle a dispute arising out of an earlier contract is sufficiently definite to be enforceable. We hold that the agreement is unenforceable and reverse the district court's judgment.
 
 
 2
 * Defendant Orr and Associates ("Orr") acted as the general contractor for the United States Army Corps of Engineers in the construction of the Chicago Bulk Mail Center in Forest Park, Illinois. On May 1, 1972, Orr entered into a subcontract with plaintiff Great Lakes Plumbing & Heating Co. ("Great Lakes") calling for Great Lakes to provide plumbing, heating, ventilation, air conditioning, site drainage, and site utilities for the Bulk Mail Center.
 
 
 3
 The project was completed by 1975. On February 6, 1976, Great Lakes filed suit against Orr in the district court for the Northern District of Illinois, contending that a substantial amount of money to which it was entitled under the subcontract remained unpaid. Great Lakes sought relief under the Miller Act, 40 U.S.C. §§ 270a, 270b, which requires the contractor for any federal building to furnish a bond and permits any person who furnished labor or material in the construction of the building to bring an action in federal court for payment out of that bond. Great Lakes also sought relief under a pendent claim that Orr had breached the subcontract.
 
 
 4
 On July 9, 1976, representatives of both parties met in an effort to settle the lawsuit. They entered into the following written agreement:
 
 
 5
 O & A will issue final payment in the amount of $613,350.00 as final contract settlement with GLHP and all of their subcontractors with proper legal releases from all parties. It is anticipated that all legal releases and final payment will be exchanged by the end of July, 1976.[2]
 
 
 6
 The attorneys for the parties then attempted to draft the "proper legal releases" contemplated in the July 9 agreement. On July 22, 1976, counsel for Orr sent a proposal to counsel for Great Lakes. See Appendix A. The terms of this draft were unacceptable to counsel for Great Lakes, who responded with a counterproposal on July 29. See Appendix B. The attorneys then began negotiating by telephone in an effort to settle their differences.
 
 
 7
 The parties have different accounts of the facts that ensued. Orr contends that by August 4, after repeated negotiations by telephone, counsel for Orr and counsel for Great Lakes agreed that they had reached an impasse on the issue of releases and further agreed to break off negotiations unless there was a change in position. Orr also asserts that sometime between August 6 and August 18 it learned that, contrary to its previous understanding, the Army Corps of Engineers had decided it would not immediately pay Orr for the work done on the Bulk Mail Center, making it economically unfeasible for Orr to immediately pay any of its subcontractors. This caused Orr to announce on August 18 that it no longer wished to settle the Miller Act claim and that it would no longer negotiate on the issue of legal releases under the July 9 agreement.
 
 
 8
 Great Lakes contends that no impasse was reached on August 4 and that counsel for both sides merely agreed on that date that they had no further suggestions. It asserts that as late as August 16 an Orr employee had a conversation with counsel for Great Lakes and expressed the hope that the issue of legal releases could be settled. Great Lakes agrees that Orr irrevocably withdrew from negotiations on August 18 because of the Army Corps of Engineers' change of position.
 
 
 9
 On September 1, 1976, Great Lakes filed a motion in the district court to enforce the July 9 settlement agreement. It also sought an award of punitive damages against Orr for its conduct in connection with the settlement negotiations. Both parties treated this motion as one for summary judgment.
 
 
 10
 On November 15, 1976, the district court held that the July 9 agreement was binding and enforceable. It concluded that the dispute between the parties centered around whether they intended to be bound under the July 9 document and found, after examining the relevant circumstances surrounding the negotiation and execution of the agreement, that the parties did intend to be bound. It further concluded that the agreement was not unenforceable simply because it provided for the execution of releases in the future. The court found that the parties intended to enter into "the appropriate and customary legal releases" and that negotiations broke down because of a dispute as to the form, rather than the substance, of the releases.[3]
 
 
 11
 The court also ordered the parties to submit proposed releases and briefs in support of their proposals. Each party submitted the proposal which it had made during the negotiation period following the July 9 agreement. On March 21, 1977, the court ordered the parties to adopt Great Lakes' proposal because it would better effectuate their intent, expressed in the July 9 agreement, to tender "all legal releases."
 
 
 12
 The court disposed of the remaining issue in the case on March 29, 1977 by denying Great Lakes' claim for punitive damages. It also directed the entry of a final judgment pursuant to Fed.R.Civ.P. 54(b). Orr now appeals the district court's judgment insofar as it holds that the July 9 agreement is enforceable and that the parties should adopt the releases proposed by Great Lakes.
 
 II
 
 13
 Orr's initial contention is that the district court's certification of a final judgment on March 29, 1977 was erroneous because Great Lakes' claim for punitive damages was still under adjudication. This argument is frivolous. The district court disposed of the punitive damages claim on the same day that it certified the case as final. The fact that the district court's minute order denying punitive damages was a separate document from the order of certification is irrelevant. The court adjudicated all of the issues in the lawsuit by March 29, and it was entirely appropriate for it to certify the case for appeal at that time.
 
 III
 
 14
 We turn now to a review of the merits of the district court's judgment. At the outset, we must determine what law controls this case, a question which the district court never faced. The parties have not directly addressed this issue, but they seem to implicitly agree that the validity and construction of the July 9 agreement ought to be determined under Illinois law. Because they have supplied no reasons to support this assumption, however, we shall independently examine the question.
 
 
 15
 The district court's jurisdiction over the original dispute between Great Lakes and Orr was conferred by the Miller Act. The Supreme Court has held that "(t)he Miller Act provides a federal cause of action, and the scope of the remedy as well as the substance of the rights created thereby are matters of federal not state law." F. D. Rich Co. v. Industrial Lumber Co., 417 U.S. 116, 127, 94 S.Ct. 2157, 2164, 40 L.Ed.2d 703 (1974). Therefore, if this case had gone to trial the issue of whether Great Lakes was entitled to payment would have been resolved under federal law.
 
 
 16
 It is clear that the district court has the power to enforce settlement agreements reached by the parties in federal cases because otherwise the court would be frustrated in its effort to resolve cases over which it has been given explicit jurisdiction by Congress. But it is equally true that the court's jurisdiction to enforce a settlement agreement must derive from its original jurisdiction over the complaint. Federal courts do not have common law contracts jurisdiction, and they cannot enforce settlement agreements except insofar as those agreements are ancillary to the resolution of cases over which they do have jurisdiction.
 
 
 17
 It would be anomalous to utilize state law to determine the validity of the settlement agreement reached by the parties in this case, when federal law governs the substantive rights of the parties and provides the basis on which the parties were able to bring the matter into federal court in the first place, and when jurisdiction over the settlement agreement only exists as a derivative of the original federal action. We therefore hold that the enforceability of the July 9 agreement must be decided as a matter of federal law.
 
 IV
 
 18
 Orr's primary argument is that the July 9 agreement is not an enforceable contract because it is too indefinite. Specifically, Orr contends that the parties never reached a meeting of the minds on the phrase "proper legal releases" contained in the agreement, as evidenced by their inability to agree on the substance of the releases during the negotiations following July 9.
 
 
 19
 The district court primarily focused on whether the parties intended the July 9 agreement to be a binding and complete settlement of the lawsuit in determining whether the agreement was enforceable. It found that the parties did intend to be bound, and that the ensuing disagreement about the releases was a dispute about the performance of the July 9 agreement rather than an indication that no binding agreement existed.
 
 
 20
 We affirm the district court's finding that the parties intended to be bound under the July 9 agreement and that they further intended that that agreement would encompass a complete settlement of their dispute. But we do not agree with the district court that this case turns on the issue of intent. Even if the parties' subsequent disagreement over what constituted "proper legal releases" affected only the performance of the agreement, rather than the intent of the parties to be bound, the agreement still cannot be enforced if the contractual language governing performance is so indefinite that we cannot say what adequate performance would be. Jordan v. Buick Motor Co., 75 F.2d 447, 449 (7th Cir. 1935); Interocean Shipping Co. v. National Shipping & Trading Corp., 462 F.2d 673, 676 (2d Cir. 1972); Transamerica Equipment Leasing Corp. v. Union Bank, 426 F.2d 273, 274 (9th Cir. 1970); 1 Corbin on Contracts § 95, at 394 (1963).
 
 
 21
 Our adherence to this principle is not intended to deny the validity of the countervailing principle of contract law that a contract is not invalid simply because it calls for the parties to reach another agreement in the future. In order for such a contract to be enforceable, however, it is necessary that the terms to be agreed upon in the future can be determined "independent of a party's mere 'wish, will, and desire' . . ., either by virtue of the agreement itself or by commercial practice or other usage or custom." 1 Corbin on Contracts § 95, at 402. See Frank Horton & Co. v. Cook Electric Co., 356 F.2d 485, 490 (7th Cir. 1966). If the language of the contract is too indefinite to permit this determination the court cannot enforce the contract without engaging in the forbidden practice of itself supplying the terms of the agreement which the parties promised to reach in the future. National Tea Co. v. Weiss, 341 F.2d 331, 334 (7th Cir. 1965); 3 Corbin on Contracts § 541, at 94 (1960).
 
 
 22
 There are two ways in which we can find the requisite definiteness in the phrase "proper legal releases" contained in the July 9 agreement. The first is if we can objectively derive a fixed meaning from the contractual language itself, either because the phrase in question is unambiguous as a matter of ordinary linguistic interpretation or because it is a term of art in the construction industry. The second is if the subsequent conduct of the parties indicates that they did reach a meeting of the minds on July 9 when they agreed to include the phrase in their written contract, even if the contractual language was ambiguous. The district court partially relied on both methods of determining certainty, and we shall examine each of them separately.
 
 
 23
 We do not find the July 9 agreement to be sufficiently definite as a matter of ordinary linguistic interpretation to permit enforcement. The phrase "proper legal releases" could have any number of meanings depending on the view of the person interpreting it.
 
 
 24
 Great Lakes argues that the releases which it proposed achieved greater compliance with the contractual language than Orr's proposal because the Great Lakes proposal better accomplished the ultimate goal of the parties of completely resolving their dispute. In our judgment this argument demonstrates the futility of attempting to attach a fixed meaning to "proper legal releases" on the basis of linguistic analysis. First, it is not apparent that the only type of "proper" release would be one that completely resolved the parties' dispute. It is equally reasonable to suppose that the parties intended only that Great Lakes would drop its Miller Act suit in exchange for Orr's payment and that all other disputes arising out of the construction of the Bulk Mail Center would remain unresolved. Second, even if we assume that a "proper" release would completely terminate the parties' dispute, the Great Lakes' proposal did not accomplish this goal. The only form of releases which truly would have ended the dispute between the parties would have been one which totally extinguished all potential liability on either side arising out of the construction of the Bulk Mail Center. The Great Lakes proposal, however, maintained the potential liability of the parties to each other in two significant ways: first, it permitted Great Lakes to preserve any rights of indemnification against Orr for claims arising out of the construction of the Bulk Mail Center asserted by a third party against Great Lakes; and second, it permitted Orr to preserve identical rights of indemnification against Great Lakes as well as any rights Orr would have under warranties of workmanship contained in the subcontract. See Appendix B.
 
 
 25
 We are also convinced that the phrase "proper legal releases" does not have a fixed meaning as a term of art within the construction industry. The district court first held that the parties contemplated the "execution of the appropriate and customary legal releases" and then concluded that the Great Lakes proposal satisfied that standard while the Orr proposal did not. But neither the district court nor Great Lakes cited any evidence to support the proposition that Great Lakes' proposal was the customary form of releases used in the construction industry. Moreover, Orr asserts that all of its other subcontractors for the Bulk Mail Center agreed to its proposed releases. This assertion, which we must accept as true for the purpose of reviewing the district court's grant of summary judgment for Great Lakes, strongly indicates that the Great Lakes proposal was not customary in the industry.
 
 
 26
 As a matter of objective contractual interpretation, therefore, the July 9 agreement is too indefinite to be enforced. We can also enforce the contract, however, if the parties subjectively reached a meeting of the minds on July 9 and their subsequent conduct both demonstrates that each party had the same definition of "proper legal releases" and clarifies what that definition was. See 1 Corbin on Contracts § 101 (1963).
 
 
 27
 The record in this case of the parties' conduct subsequent to the July 9 agreement does not support the inference that they in fact reached a meeting of the minds on July 9. Rather, the record shows that the parties consistently clashed over the meaning of "proper legal releases" during the course of their negotiations following the exchange of proposals, indicating that they never had reached a true agreement.
 
 
 28
 The district court held that the disagreement between the parties about the content of the releases following the signing of the July 9 agreement was a matter of form rather than substance. We cannot accept this conclusion. An examination of the proposed releases, set out in Appendices A and B, demonstrates that the differences between the parties were substantial. They included:
 
 
 29
 (1) The Orr proposal did not provide for the release of Great Lakes from any claim Orr had against Great Lakes while the Great Lakes proposal provided that Orr would release Great Lakes from any claims arising out of the construction of the Bulk Mail Center except for any rights Orr would have for indemnification from Great Lakes for claims asserted by a third party and any rights Orr would have under warranties of workmanship contained in the subcontract;
 
 
 30
 (2) the Great Lakes proposal provided that Great Lakes would retain any rights of indemnification from Orr for claims asserted by a third party and arising out of the construction of the Bulk Mail Center while the Orr proposal did not do so;
 
 
 31
 (3) the Orr proposal provided that Great Lakes would assign to Orr any claim that Great Lakes had against the United States government arising out of the construction of the Bulk Mail Center while the Great Lakes proposal provided only that Great Lakes would quitclaim to Orr any claims Great Lakes had against the government, with the proviso that Great Lakes was not required to take any action in connection with those claims.
 
 
 32
 These differences were not merely matters of draftsmanship. The two proposals would have exposed each party to significantly different levels of potential liability. The parties were unable to resolve their differences despite lengthy negotiations following the exchange of proposals, and it is clear that each party defined "proper legal releases" differently. We therefore conclude that, although the parties thought they had reached a meeting of the minds when they agreed to exchange releases on July 9, they in fact had not done so.
 
 
 33
 Great Lakes contends that the dispute between the parties over the meaning of "proper legal releases" was a sham engineered by Orr to avoid performance of the July 9 agreement when it learned that the Army Corps of Engineers no longer intended to make immediate payment for the construction of the Bulk Mail Center. It argues that the parties would have reached an agreement on the issue of releases if Orr had negotiated in good faith and that Orr did not negotiate in good faith because it discovered that the July 9 agreement, calling for Orr to immediately pay Great Lakes, was a bad business decision in light of the fact that the Army Corps of Engineers would not immediately pay Orr. It further asserts, relying on Evans, Inc. v. Tiffany & Co., 416 F.Supp. 224 (N.D.Ill.1976), that the remedy imposed by the district court was proper in light of Orr's bad faith.[4]
 
 
 34
 The validity of this argument is undermined by Great Lakes' own version of the facts. According to Great Lakes, Orr was willing to negotiate on the issue of releases as late as August 16 and did not announce its intention to withdraw from negotiations until August 18. The most probable inference to be drawn from this account of the facts is that Orr was informed of the Army Corps of Engineers' change of policy between August 16 and August 18.[5] But if Orr did not learn of the Government's decision until the middle of August, the only explanation for Orr's refusal to agree to releases following the exchange of proposals at the end of July and the subsequent negotiations by telephone is that Orr and Great Lakes had a bona fide dispute about the substantive content of the releases. We do not need to accept Orr's contention that the parties had reached an impasse on August 4 to conclude that their differences were both legitimate and significant, and might never have been reconciled even if Orr had not withdrawn from negotiations.
 
 
 35
 We do not find our conclusion to be at odds with the result reached in Evans. In that case plaintiff and defendant signed an agreement calling for defendant to rent plaintiff's property and further providing that the parties would enter into a formal lease in the future. The court found that the agreement was enforceable because it specified all of the essential terms to be included in the lease, and held that the agreement imposed on defendant a duty to negotiate in good faith which it had breached. In this case, by contrast, the agreement which the parties signed did not specify the essential elements of the releases to be negotiated in the future. Moreover, the plaintiff in Evans refused offers to rent its property in reliance on its agreement with the defendant. Thus, the relief which the court granted was partially grounded on principles of promissory estoppel which are absent from the case at bar.
 
 
 36
 In summary, it is impossible to attach a definite meaning to the July 9 agreement, either by objective analysis of the contractual language or by examining the subjective intent of the parties in light of their conduct following July 9. This uncertainty renders the agreement unenforceable. The district court exceeded its authority when it ordered the parties to enter into the releases proposed by Great Lakes and thereby imposed upon the parties a contract that they did not reach themselves.
 
 
 37
 The judgment of the district court is reversed and the cause is remanded for further proceedings consistent with this opinion.
 
 Gentlemen:
 
 38
 Orr & Associates (J.V.) ("O&A"), for itself and on behalf of its joint venture members, and Great Lakes Plumbing & Heating Co., Inc. ("Great Lakes"), for and in consideration of the mutual promises and covenants contained herein agree as follows:
 
 
 39
 1. O&A agrees to pay, and Great Lakes agrees to accept, $613,350, in full payment and satisfaction of all claims, rights, and demands which Great Lakes, its successors or assigns, have or might have against O&A, its joint venture members, its sureties, or their successors or assigns, arising out of, connected with, or in any way relating to the above captioned project, or for any work done or anything furnished in connection with such project, or for any other person in connection with, in relation to or in any way concerned with such project.
 
 
 40
 2. This payment does not release Great Lakes from its obligations under the above-referenced subcontracts.
 
 
 41
 3. Great Lakes agrees that contemporaneously with receipt of the payment described in P (1), supra, it will deliver to O&A stipulations in the form and substance of those attached hereto as Exhibits 1, 2 and 3 providing for dismissal, with prejudice, of the following lawsuits: United States of America f/u/o Great Lakes Plumbing & Heating Co. v. Orr Construction Company, et al., 76 C 440; United States of America f/u/o Pullman Sheet Metal Works, Inc. and Pullman Sheet Metal Works, Inc., an Illinois Corporation v. Orr Construction Company, et al., 76 C 1480; United States of America f/u/o Brand Insulations Inc. and Brand Insulations, Inc., an Illinois Corporation v. Orr Construction Company, et al., 76 C 1214.
 
 
 42
 4. In consideration of the payment described in P (1), supra, Great Lakes hereby assigns to O&A any claim it has or may have for or on account of any claim against the United States Government, or the proceeds of any such claim, which has been submitted to O&A and submitted by O&A to the Government, or which has been or may be negotiated by O&A with the Government.
 
 
 43
 5. Great Lakes hereby certifies that all costs, bills and charges whatsoever incurred with respect to the Chicago Bulk Mail Center Project have been satisfied in full and that there are no outstanding unpaid obligations for bills due to any persons, firms or corporations for labor, services, materials, supplies or subcontractors' work whatsoever incurred in and about the performance of work on said project. In the event that any claim is made by any party or authority against O&A with respect to the Project on account of an unpaid obligation of or claim against Great Lakes, Great Lakes hereby indemnifies and holds harmless O&A from any of said claims and the costs and expenses of defending against such claims.
 
 APPENDIX B
 APP
 THE GREAT LAKES PROPOSAL
 AGREEMENT
 
 44
 This Agreement entered into this ____ day of ______, 1976 by and between Orr & Associates (J.V.), a joint venture, ("Orr"), for itself and on behalf of each of its joint venture members, and Great Lakes Plumbing & Heating Co., an Illinois corporation ("Great Lakes").
 
 RECITALS
 
 45
 A. Orr and Great Lakes are parties to that certain Subcontract (the "Subcontract") dated May 1, 1972 concerning the construction of the Chicago Bulk Mail Center (the "Project").
 
 
 46
 B. A dispute arose between Orr and Great Lakes with respect to the Subcontract and the Project.
 
 
 47
 C. The parties are desirous of resolving all such disputes as the terms and conditions hereof.
 
 
 48
 NOW THEREFORE, in consideration of the Recitals, the terms and conditions hereof and other valuable considerations, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:
 
 
 49
 1. Orr shall pay Great Lakes the sum of $613,350, the receipt of which is hereby acknowledged.
 
 
 50
 2. Great Lakes shall deliver to Orr Stipulations in the form and substance of those attached hereto as Exhibits 1, 2 and 3 providing for dismissal, with prejudice, of the following lawsuits: United States of America f/u/o Great Lakes Plumbing & Heating Co. v. Orr Construction Company, et al., 76 C 440; United States of America f/u/o Pullman Sheet Metal Works, Inc., and Pullman Sheet Metal Works, Inc., an Illinois Corporation v. Orr Construction Company, et al., 76 C 1480; United States of America f/u/o Brand Insulations Inc. and Brand Insulations, Inc., an Illinois Corporation v. Orr Construction Company, et al., 76 C 1214, the receipt of which is hereby acknowledged.
 
 
 51
 3. (a) Great Lakes, for itself, its successors and assigns (collectively referred to in this subparagraph (a) as "Great Lakes"), hereby releases and forever discharges Orr, its joint venture members, its sureties, and its or their successors and assigns (collectively referred to in this subparagraph (a) as "Orr"), from any and all claims, demands, liabilities, monies due, debts and causes of action arising out of, connected with, or in any way relating to the Subcontract or the Project; provided, however, that there shall be excluded from this release (i) any and all rights to indemnification, contribution, or other reimbursement in whole or in part from Orr that Great Lakes would otherwise have by law or under the terms of the Subcontract but for the aforesaid release, to the extent of loss, damage, cost and expenses, including reasonable attorneys' fees, actually incurred or paid by Great Lakes, with respect to any bona fide claim which is hereafter asserted against Great Lakes by any third party and of which Great Lakes presently has no knowledge, other than any such claim for monies due from Great Lakes for work performed on or materials delivered to the Project under a contract between Great Lakes and any such third party and (ii) the undertakings of Orr under Paragraph 5 below.
 
 
 52
 (b) Orr, for itself, its joint venture members, and its or their successors and assigns (collectively referred to in this subparagraph (b) as "Orr"), hereby releases and forever discharges Great Lakes, its agents, employees, officers, directors, shareholders, and its or their successors and assigns (collectively referred to in this subparagraph (b) as "Great Lakes"), from any and all claims, demands, liabilities, monies due, debts and causes of action arising out of, connected with, or in any way relating to the Subcontract or the Project; provided, however, that there shall be excluded from this release:
 
 
 53
 (i) any and all rights to indemnification, contribution or other reimbursement in whole or in part from Great Lakes that Orr would otherwise have by law or under the Subcontract but for the aforesaid release, to the extent of loss, damage, cost and expenses, including reasonable attorneys' fees, actually incurred or paid by Orr, with respect to any bona fide claim which is hereafter asserted against Orr by any third party and of which Orr presently has no knowledge other than (A) any such claim between or among Orr's present, past or future joint venture members, (B) any such claim asserted by the United States government or any agency or official thereof relating to the portion of the work covered by the Subcontract; and (C) any such claim by the Sureties on Orr's Miller Act bond relating to the claim of a third party with respect to which there would be no exclusion from this release;
 
 
 54
 (ii) any and all rights that Orr would otherwise have by virtue of any warranties of workmanship or material expressly set forth in the Subcontract, including without limitation any such rights arising by reason of a claim against Orr by the United States government or any agency or official thereof; and
 
 
 55
 (iii) the undertakings of Great Lakes under Paragraphs 4 and 7 below.
 
 
 56
 4. Great Lakes warrants that it is the absolute owner of all claims and rights of the subcontractor under the Subcontract, that it has not pledged, assigned, or otherwise encumbered or disposed of the same, and that it has authority to give the releases contained in this Agreement.
 
 
 57
 5. Orr warrants that it is the absolute owner of all claims and rights of the contractor under the Subcontract, that it has not pledged, assigned, or otherwise encumbered or disposed of the same, and that it has authority to give the releases contained in this Agreement. Without limiting the generality of the foregoing sentence, Orr expressly warrants that its execution of this Agreement is not in violation of any of the rights of any of its surety or bonding companies, and that it is fully authorized to enter into this Agreement and grant the releases herein without the consent or authorization of any of said companies.
 
 
 58
 6. Great Lakes hereby quitclaims to Orr, without any warranties or recourse, any claims that it may have against the United States government in connection with the Project; provided, however, that nothing herein shall require Great Lakes to take any action, perform any services, or prepare any documents, or otherwise incur any cost, expense, or liability in connection with any such claims.
 
 
 59
 7. Great Lakes hereby certifies that all costs, bills and charges whatsoever incurred by it with respect to the Project have been satisfied or released in full and that there are no outstanding unpaid obligations for bills due to any persons, firms, or corporations for labor, services, materials, supplies or subcontractors' work whatsoever incurred by Great Lakes in connection with the Project.
 
 
 60
 IN WITNESS WHEREOF the parties hereto have executed this Agreement on the date first above written.
 
 
 
 [1]
 The Honorable William J. Campbell, United States Senior District Judge for the Northern District of Illinois, sitting by designation
 
 
 [2]
 It is undisputed that "O&A" referred to Orr and "GLHP" referred to Great Lakes
 
 
 [3]
 Orr appealed the November 15 order to this court. On February 16, 1977, we dismissed the appeal because the November 15 order did not dispose of Great Lakes' entire claim and therefore was not a final judgment under Fed.R.Civ.P. 54(b)
 
 
 [4]
 The district court never made a finding as to whether Orr was acting in bad faith
 
 
 [5]
 Another possible explanation is that Orr knew of the change in policy earlier but continued to feign interest in negotiating in order to avoid liability for acting in bad faith. This explanation very likely is incorrect, however, because if Orr had thought that it could have avoided liability by pretending to negotiate it would have continued to do so instead of withdrawing from the negotiations