Michael G. POHL, Plaintiff,

v.

UNITED AIRLINES, INC., Defendant.

No. IP 97–1246–C B/S.

United States District Court,
S.D. Indiana,
Indianapolis Division.

Oct. 21, 1999.

Lawrence M. Reuben, Indianapolis, IN, for Plaintiff.

James W. Clark, Baker & Daniels, Indianapolis, IN, for Defendant.

## ENTRY GRANTING DEFENDANT'S MOTION TO ENFORCE SETTLEMENT AGREEMENT

BARKER, Chief Judge.

Defendant, United Airlines, Inc. ("United"), has requested that we enforce a settlement agreement purportedly entered into between itself and Plaintiff, Michael G. Pohl ("Pohl"). An evidentiary hearing on the motion was conducted on October 1, 1999. For the reasons discussed below, we *GRANT* United's motion and order Pohl to adhere to the settlement agreement terms as negotiated by United's counsel and Pohl's attorney, Christopher Herrmann ("Herrmann") of Haskin Lauter Cohen & Larue ("Firm").

### Findings of Fact

Pohl commenced a lawsuit against United, pursuant to the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), 38 U.S.C. §§ 4301, *et seq,* contending that United had discriminated against him in various ways based upon his service in the United States Air Force Reserves ("Reserves"). *See* Complaint. Pohl brought three claims: discrimination based on Pohl's military status ("Count I"), retaliation ("Count II"), and the failure to properly credit Pohl's benefits for the periods when Pohl was serving in the Reserves ("Count III"). *See* Compl.

In May 1997, Pohl retained the Firm to represent him in his case against United. (Direct Examination of Michael G. Pohl ("Pohl Direct")). In a meeting with John H. Haskin ("Haskin"), Pohl signed one of the Firm's standard retainer agreements, although he added a handwritten note in the margin of page four. (Pohl Direct; Pl.Ex. B., at 4). For the purposes of this matter, the two key provisions of this contract are part II, titled "Scope of Repre-

sentation," and part X, titled "Power of Attorney to Execute Documents." *Id.* Part II provides that

> [t]he Client empowers the Firm to settle and compromise the matter in controversy or to bring such legal action as may be necessary to fully and completely represent and protect Client's interest based upon the attorney's experience and training, within his/her sole discretion, which may include, but is not limited to correspondences . . . negotiation, [and] drafting of legal documents . . . .

*Id.* at 1. Part X gives the Firm the "Power of Attorney to execute all documents connected with the claim . . . including . . . settlement agreements, compromises and releases . . . ." *Id.* at 4. In the margin next to Part X, appears Pohl's handwritten note, "with my authorization." *Id.* (Pohl Direct).

At their initial meeting, Haskin gave Pohl the standard retainer agreement and left Pohl and his wife alone to discuss it. (Pohl Direct). He and his wife "did not like the idea of [the Firm] having total authority to settle this matter without [their] intervention." (Pohl Direct). When Haskin returned to the room, he told Pohl that, in light of their concern, he should write " 'with my authorization' and basically do a line towards the settlement agreements, [and] that should relieve any fears or misgivings [Pohl] might have." (Pohl Direct).

Some months later the parties attended a December 15, 1998 settlement conference with Magistrate Judge Shields after attempts between the parties at informal resolution of the matter had failed. (Direct Examination of James W. Clark ("Clark Direct")). Attending this conference were Clark, who was counsel for United; a representative from United; Haskin and Herrmann, co-counsel for Pohl; Pohl; and his wife, Barbara J. Pohl ("Mrs.Pohl"). (Clark Direct). The parties dispute portions of the conversations that occurred at this conference, but all parties agree that the conversations focused on Count III. Pohl maintains that he tried to raise for discussion Counts I and II but was told by Judge Shields that they were not going to be able to settle those claims at the conference and that they should address Count III. (Pohl Direct). According to Pohl, the discussion focused on Count III because it was

> the only issue that appeared we could actually resolve and get it [sic] off the Court's docket . . . because it basically boiled down to those two questions: Am I entitled to those shares for time spent doing military duty, yes or no? If the answer was yes, then the question was whether or not I had been fully credited.

(Pohl Direct). Pohl also claims that he informed everyone at the conference that he wanted to see the documentation related to crediting his ESOP account before he would consider settling that claim. (Pohl Direct). In contrast, Clark states that the discussions centered on Count III because the parties had "narrowed the issues" to Count III, (Clark Direct), and Herrmann claims Count III "took the lead [because it was] the most viable action against United that we had at that point." (Direct Examination of Christopher Herrmann ("Herrmann Direct")).

The settlement conference adjourned after United was unable to determine at that time the status of Pohl's employee stock ownership ("ESOP") account. (Clark Direct). Thereafter, Herrmann took over from Haskins the lead role in litigating Pohl's military discrimination case against United. (Pohl Direct; Herrmann Direct).

Herrmann and Haskin had left the December 15 settlement conference feeling that settlement of the entire case would result if United properly credited Pohl's ESOP account. (Herrmann Direct). By January 1999, United had determined that it had inadvertently omitted credits to Pohl's ESOP account and that it was appropriate to negotiate a settlement. (Clark Direct). In late January or early February 1999, Clark and Herrmann con-

ferred and "quickly agreed on the basic conceptual outlines of what a settlement would look like." (Clark Direct).

Under the terms of their proposed settlement, United was to credit Pohl's ESOP account and provide Pohl with documentation explaining how the credits had been determined. (Clark Direct). In addition, United promised to not retaliate against Pohl for filing this litigation and to pay his reasonable attorneys' fees. (Clark Direct). In response, Herrmann promised on behalf of Pohl that the entire Complaint would be dismissed, that Pohl would release United from any liability for claims arising from the facts alleged in his complaint, except to the extent these facts form the basis for a claim under the Americans With Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, et seq, and that Pohl would maintain the confidentiality of the settlement agreement. (Def. Ex. 1, Attach. B; Clark Direct). Finally, the attorneys agreed that nothing in the settlement agreement would constitute an admission of liability by either party. (Clark Direct). The only aspect left unsettled was the specific amount of attorneys' fees to be included within the terms of the agreement. (Clark Direct).

Over the next few weeks, Clark and Herrmann negotiated the amount of attorneys' fees to be included as part of the settlement agreement. (Clark Direct). Finally, on February 24, 1999, Clark and Herrmann agreed that United would pay $15,000 as attorneys' fees. (Clark Direct; Herrmann Direct). The Firm's billing records show a forty-two minute phone call between Herrmann and United's counsel on that day. See Def. Ex. 3, at 14. During this phone call, Herrmann and Clark reviewed each of the terms of the agreement, including the negotiated attorneys' fees and agreed on the settlement. (Herr-

mann Direct). Believing that they had successfully negotiated a settlement, either Clark or Herrmann contacted Judge Shields who vacated the next day's status conference with the Court. (Clark Direct).

Based upon the attorneys' conversations, United prepared a written document "that memorialized the settlement agreement" and forwarded that draft to Herrmann in April 1999. (Clark Direct). Herrmann made a couple of revisions to the draft submitted by Clark and faxed the document back to Clark on May 7, 1999; the majority of the draft, however, appears to have been satisfactory to Herrmann. See Def. Ex. 1, Attach. A.[1] The only substantive paragraph added at Herrmann's request provided that United would give Pohl the documentation that he had requested. See id. Clark apparently "had simply forgotten to include" this paragraph in the draft and thus willingly incorporated the changes. (Clark Cross). Clark forwarded a copy of the final document to Herrmann on May 28, 1999. See Def Ex. 1, Attach. B. On June 1, 1999, Clark forwarded to Herrmann another copy of the agreement which United had executed and told Herrmann that a check covering the attorneys' fees would be sent soon. See Def. Ex. 1, Attach. C.

Clark acknowledges that he had never specifically verified with Herrmann his authority to settle this case on Pohl's behalf. (Clark Cross). He admits that Herrmann never provided Clark with any documentation relating to the scope of his authority to act on Pohl's behalf. (Clark Cross). Herrmann also never explicitly stated to Clark that he had the authority to negotiate a settlement for Pohl. (Clark Cross). However, Herrmann had told Clark that he had conferred with Pohl about the settlement negotiations from time to time.

---

1. One change was to alter the language of paragraph 2 from "United certifies that it has fully credited Pohl's [accounts]" to "United certifies that it will fully credit Pohl's [accounts]." (Compare Def. Ex. 1, Attach. A with Def. Ex. 1, Attach. B). Herrmann and Clark both understood this language to provide additional protection for Pohl. (Clark Cross). If Pohl later believed that additional credits were required, "then he would have a right to enforce against United." (Clark Cross).

(Clark Cross). In fact, after Pohl refused to sign the agreement on June 2, 1999, Herrmann told Clark that Herrmann had spoken with Pohl about each element of the agreement and Pohl had approved in advance each element. (Clark Redirect)

Herrmann testified that he kept Pohl advised about the settlement negotiations and that Pohl expressly agreed to dismiss all three counts as part of the settlement. (Herrmann Direct). One way Herrmann kept Pohl informed as to the status of the negotiations was through a series of phone conversations with Pohl and Mrs. Pohl.[2] Herrmann testified that in those conversations he and Pohl covered both settlement generally and Herrmann's authority. (Herrmann Direct). With regard to settlement, Pohl had said that he wanted full credit for the missing ESOP shares and documentation describing how United determined the amount missing. (Herrmann Direct). During the settlement negotiations, Herrmann communicated this request to Clark and in response Clark agreed to incorporate a provision relating to documentation. (Herrmann Direct).

Prior to the February 24, 1999 phone conversation between Herrmann and Clark in which the final agreement was reached, Herrmann testified that he and Pohl "had discussed exactly the terms of the settlement agreement." (Herrmann Direct). In addition, Herrmann said that he explicitly told Pohl that he (Herrmann) was negotiating a settlement with Clark and received Pohl's "express permission" to the terms of the settlement agreement. (Herrmann Direct). "Pohl had certainly agreed to every single one of the provisions and granted [me] authority to settle the case on his behalf for all the crediting of the ESOP, all the things contained with-

in the settlement agreement, and specifically the $15,000 in attorneys' fees." (Herrmann Direct).

Pohl concedes that Herrmann and he spoke frequently during the negotiations with Clark.[3] However, they disagree as to the content of these conversations. While Pohl acknowledges that he had phone conversations with Herrmann between December 15, 1998 and March 1999, he asserts that he never agreed to include Counts I or II as part of settlement negotiations and that he agreed to settle Count III only after first receiving the requested documentation. (Pohl Direct). Moreover, Pohl maintains that Herrmann had never told him that Counts I and II were not likely to succeed on the merits. (Pohl Direct).

In addition to the phone conversations between Herrmann and Pohl during the negotiations, Herrmann prepared and sent a letter to Pohl on March 8, 1999 confirming the "settlement of [Pohl's] *current federal court case* against United Airlines." Def. Ex. 4 (emphasis added). The letter states that, "[a]s [Pohl] instructed, [Herrmann] negotiated a settlement that included the recovery of attorney fees [sic] as well as you [sic] ESOP shares." *Id.* The letter continues with a discussion of the details of the settlement agreement, including the anti-retaliation clause, attorneys' fees, and the documentation that United was to provide Pohl under the terms of the agreement, although the letter never explicitly states that the settlement included all three claims. *See id.* With respect to the attorneys' fees, the letter states that Pohl could only recover "attorney fees [sic] that were *incurred as a result of the military discrimination*

---

2. As will be discussed more fully below, Herrmann also sent a letter to Pohl on March 8, 1999 to inform him that the negotiations had been successful and that settlement had been reached.

3. Between the December 15 conference and March 8, 1999, when Herrmann sent a letter to Pohl indicating that settlement had been

reached, the Firm's billing records reflect a total of ten phone calls between Herrmann and either Pohl or Mrs. Pohl. *See* Def. Ex. 3, at 13–14. These records also show that before or after each and every one of the calls to Pohl, Herrmann was in contact with United's counsel. *See id.*

*suit,* and not fees incurred relevant to [Pohl's] ADA claim." *Id.* (emphasis added). Finally, the letter informs Pohl that he needs to sign and return the settlement agreement as soon as possible "so that we can go forward *with your ADA claim.*" *Id.* (emphasis added).

Upon receiving the March 8 letter, Pohl claims that he was unclear as to what exactly the settlement included. (Pohl Direct). While Pohl's initial reaction was that the first sentence was referring to all of the counts in this case, to the best of his knowledge, "the only case that was being discussed . . . was Count [III]." (Cross Examination of Michael G. Pohl ("Pohl Cross")). Even if the letter did refer to all three claims, Pohl said he was not concerned because, based upon the retainer agreement he had signed with the Firm, he felt that "it didn't mean it was settled until [Pohl] signed off on it." (Pohl Cross).

After receiving Herrmann's letter, Pohl claims to have called and left several messages for Herrmann, asking for the documentation related to his ESOP account. (Pohl Direct). Herrmann had no recollection of receiving any such messages from Pohl, but acknowledges that one of the reasons he met with Pohl and Mrs. Pohl in late April 1999 was because Pohl "thought that [the Firm was] not returning his phone calls." (Herrmann Cross). The only non-testimonial evidence related to these telephone messages are the Firm's billing records which do not reflect Herrmann's attempts to call Pohl until an April 19, 1999 entry. *See* Def. Ex. 4, at 15. On that day, Herrmann spoke to Pohl for almost thirty minutes. *See id.* Though Herrmann does not recall the specifics of that phone conversation, (Herrmann Direct), Pohl testified that he asked Herrmann about the specific terms of the settlement agreement but that Herrmann failed to provide him with any details. (Pohl Direct).

When Pohl, along with his wife, met with Herrmann on April 26, 1999 to sign the retainer contract to allow the Firm to pursue Pohl's ADA case, Pohl allegedly asked to see the settlement agreement, in response to which Herrmann said that the Firm did not yet have the document. (Pohl Direct; Def. Ex. 4, at 15). Despite the fact that Pohl had this face to face meeting with Herrmann, Pohl did not mention anything regarding Herrmmann's March 8 letter to him. (Pohl Cross).

At some point thereafter, Pohl telephoned Judge Shields' chambers and spoke with her directly. (Pohl Direct). During this conversation, Judge Shields informed Pohl that the entire complaint had been settled. (Pohl Direct). Pohl claims this is the first he heard that the settlement involved all three claims. (Pohl Cross).[4]

Upon hearing from Pohl, Judge Shields scheduled another status conference for June 2, 1999. Clark, along with a United representative, Herrmann, Pohl, and Mrs. Pohl were in attendance. (Clark Direct). There, for the first time, Pohl saw the written settlement agreement. (Pohl Direct). After reviewing it, Pohl testified that he was enraged. (Pohl Direct). He noticed that it included Counts I and II without his authority, and that none of the documentary evidence he had requested had yet been provided. (Pohl Direct). At the conference Pohl spoke at length about grievances against United but never said specifically what he wanted as part of the settlement that was not already included. (Clark Cross). Pohl also expressed concern that he had not seen the agreement prior to June 2, although he acknowledged that he had received Herrmann's March 8 letter. (Herrmann Direct). Pohl refused to execute the settlement agreement document. (Clark Direct).

---

4. Though Pohl indicates that he played more "phone tag" with Herrmann prior to contacting Judge Shields, the Firm's billing records do not reveal any phone calls from Herrmann to Pohl until May 28, 1999. *See* Def. Ex. 4, at 16.

Since the June 2 conference, United has credited Pohl's ESOP account for all missing dates from 1994, 1995, and 1996 of which Pohl had made United aware. (Clark Direct). Apparently, Pohl has subsequently found additional dates for which United has not credited his ESOP account. (Clark Direct). United, however, fully intends to credit Pohl's accounts for these dates when "United's ESOP Plan goes through its annual accounting cycle this spring." (Clark Direct). United has drawn the $15,000 check to cover attorneys' fees but has not tendered it, waiting until the settlement documents are fully executed. (Clark Direct). Clark maintains that United has, thus, fully performed its obligations under the agreement reached with Pohl and asks the Court to require Pohl to do the same. (Clark direct). Pohl continues to refuse to sign the agreement.

### Conclusions of Law

This case devolves into two basic legal issues: first, did Herrmann and Clark form a binding, enforceable, oral settlement agreement during their negotiations; second, if so, did Herrmann have the authority to reach such an agreement on Pohl's behalf. If we find that a binding, enforceable, oral settlement agreement was reached with Pohl's authorization, a judgment enforcing the agreement should enter. *See United States for Use of Great Lakes Plumbing & Heating Co. v. Orr Const. Co.*, 560 F.2d 765, 768–69 (7th Cir. 1977); *Scott v. Randle*, 697 N.E.2d 60, 66 (Ind.Ct.App.1998). After reviewing the evidence and the applicable legal authorities, we conclude that a binding, enforceable, oral settlement agreement was formed by Herrmann and Clark. We also hold that Pohl had granted Herrmann the authority to act on his behalf and bind him to this settlement agreement. Accordingly, we find that the settlement agreement is enforceable against Pohl and *GRANT* Defendant's motion to enforce the settlement agreement.

### A. A Binding, Enforceable, Oral Settlement Agreement Was Formed.

■ The first issue we address is whether an enforceable agreement to settle Pohl's federal claim was actually reached as a result of the negotiations between Herrmann and Clark. It remains unsettled under Seventh Circuit law whether a dispute over the settlement of a federal case arises under state law or federal law. *See Fleming v. United States Postal Serv. AMF O'Hare*, 27 F.3d 259, 260 (7th Cir.1994). While there is authority to support both propositions, *compare Carr v. Runyan*, 89 F.3d 327, 331 (7th Cir.1996) (finding dispute regarding settlement agreement governed by state law), *and Natare Corp. v. Aquatic Renovation Sys. Inc.*, 987 F.Supp. 695, 697 (S.D.Ind. 1998), *with Taylor v. Gordon Flesch Co.*, 793 F.2d 858, 862 (7th Cir.1986) (finding dispute regarding settlement agreement governed by federal law), *and Orr*, 560 F.2d at 769; *see also Wilson v. Wilson*, 46 F.3d 660, 666–67 (7th Cir.1995) (stating that state law should govern dispute regarding settlement agreement if the claim is a state law claim and federal law should govern dispute regarding settlement agreement if the claim arises under federal law), we have nonetheless been directed to adopt state law as the federal rule "unless to do so would disserve federal interests." *Fleming*, 27 F.3d at 260 (citing *Lumpkin v. Envirodyne Indus., Inc.*, 933 F.2d 449, 457–58 (7th Cir.1991)). Adopting state law as the federal rule seems particularly appropriate when the issue involves general principles of contract law, *see Fleming*, 27 F.3d at 260, such as the elements necessary to form a binding contract. *See* RICHARD A. LORD, WILLISTON ON CONTRACTS § 3.2 (4th ed.1990); RESTATEMENT (SECOND) OF CONTRACTS § 17. Thus, we will draw on Indiana law to determine whether a binding contract was reached by the parties in this case.

To create a binding contract, there must be an offer, acceptance of that offer, and a meeting of the minds between the contracting parties. *See Straub v. B.M.T.*, 645 N.E.2d 597, 598 (Ind.1994). Although some form of assent to the terms of the contract is necessary, "the validity of a contract is not dependant upon the signature of the parties." *International Creative Management, Inc. v. D & R Entertainment Co.*, 670 N.E.2d 1305, 1312 (Ind.Ct.App.1996). Thus, as long as there is evidence to show that a meeting of the minds has occurred, a signed document is not the *sine qua non* to the creation of a binding contract. *See Natare Corp.*, 987 F.Supp. at 699.

Oral settlement agreements are no different then any other oral contract. Indiana law recognizes that two parties may reach an oral, binding settlement agreement. *See, e.g., Silkey v. Investors Diversified Servs., Inc.*, 690 N.E.2d 329, 333 (Ind.Ct.App.1997) (citing *Klebes v. Forest Lake Corp.*, 607 N.E.2d 978, 982 (Ind.Ct.App.1993)).[5] If one party "transmit[s] a clear and unambiguous settlement offer which [is] accepted by the [other party] ... the parties [have] reached a binding settlement agreement." *Klebes*, 607 N.E.2d at 982–83; *see also Bain v. Board of Trustees of Starke Memorial Hosp.*, 550 N.E.2d 106, 110 (Ind.Ct.App. 1990) (holding that settlement agreement is culminated once an offer has been accepted).

In *Klebes*, the plaintiff's attorney proposed a settlement with opposing counsel which was accepted during a subsequent telephone conversation. *Id.* at 982. The appellate court found that the parties reached a binding settlement agreement. *See id.* Their oral agreement was followed by a letter from one attorney to the other memorializing the agreement. *See id.* at

983. That the clients never signed the settlement documents was "of no moment because it [was] undisputed that [the attorney] acted as the [clients'] agent when he settled the case according to the terms previously approved by the [clients]." *Id.*

In the case at bar, Herrmann and Clark also reached an oral, binding agreement as the culmination of their negotiations. Both attorneys testified unequivocally that they readily agreed on the framework of a settlement agreement. While most of the terms were quickly resolved, the remaining issues were negotiated over the course of several weeks in the course of the attorneys' frequent conferences and ultimately were resolved as well. On February 24, 1999, Herrmann and Clark both testified that they repeated verbally to each other each term of the settlement agreement to confirm their agreement. Being assured of an agreement between them, they contacted Judge Shields to request that the February 25, 1999 status conference be canceled. At this point, Herrmann and Clark clearly had reached a "meeting of the minds," as referenced in *Straub, International Creative Management, Inc.*, and *Natare*, and a binding contract had been formed.

The written document prepared by the attorneys for final execution by the parties was not an attempt at further negotiations between the parties. Clark testified that the document was meant only to "memorialize[ ] the settlement agreement." (Clark Direct). Upon receiving the draft document, Herrmann made only two changes to it, adding one substantive paragraph which Clark "had simply forgotten to include" in the agreement and changing the language stating that United "has fully credited Pohl's ... accounts" to United "will fully credit Pohl's ... accounts."

---

5. Federal law also recognizes that an oral settlement agreement is binding and enforceable so long as it contains "all the terms of the contract to be made." *Taylor*, 793 F.2d at 862; *see also Glass v. Rock Island Refining Corp.*, 788 F.2d 450, 454 (7th Cir.1986) (recognizing oral settlement agreement under federal common law); *accord John Boettcher Sewer & Excavating Co. v. Midwest Operating Eng'rs Welfare Fund*, 803 F.Supp. 1420, 1426 (N.D.Ind.1992).

(Clark Cross; *compare* Def. Ex. 1, Attach. A, *with* Def. Ex. 1, Attach. B). Like the attorneys in *Klebes*, the attorneys, in re-working their draft agreement, were simply assuring that all of the previously agreed upon details had been included in it. The oral settlement agreement must be construed, therefore, as a binding contract which United may seek to have enforced.

## B. Pohl Authorized Herrmann to Orally Agree To Settle Pohl's Military Discrimination Claims Against United.

Having determined that Clark and Herrmann reached a binding, oral agreement to settle Pohl's military discrimination claims against United, we next address whether the attorneys negotiating the oral agreement were acting with authority to bind their respective clients. It is undisputed that Clark was authorized to bind United, so we turn our attention to whether Herrmann was acting with authority to bind Pohl. To answer this question, we examine the agency relationship between Herrmann and Pohl.

■ As was true when analyzing the issue of contract formation, there is again no clear Seventh Circuit precedent concerning whether we are to apply federal or Indiana law in determining if Herrmann was acting within the scope of his authority when he reached the oral agreement with Clark. However, both parties in their submissions to the Court have assumed that this issue is governed by Indiana law and, in fact, that federal and state law are in agreement as to the applicable agency rules.[6] Therefore, we will utilize Indiana law in evaluating the agen-

cy relationship between Pohl and Herrmann.

■ The Indiana Supreme Court has recently clarified and elucidated what authority is necessary for an attorney to settle a case on his client's behalf. *See Koval v. Simon Telelect, Inc.*, 693 N.E.2d 1299 (Ind.1998). Prior to *Koval*, Indiana law was unsettled as to whether a settlement agreement could be reached by an attorney relying upon implied or apparent authority stemming only from being retained by the client to pursue the claim at issue. *See Koval v. Simon-Telelect, Inc.*, 979 F.Supp. 1222, 1232 (N.D.Ind.1997) (certifying to Indiana Supreme Court the issue of what authority is necessary to bind a client to a settlement agreement). In response to the Northern District's question, the Supreme Court first held that "an attorney's implied authority does not extend to settling the very business that is committed to the attorney's care without the client's consent." *Koval*, 693 N.E.2d at 1302. Thus, "the retention of an attorney does not without more carry implied authority to the attorney to settle." *Id.* at 1303. Retaining an attorney "may be a 'communication' to third parties that they should prepare for a lawsuit, but beyond that, it tells third parties little." *Id.* at 1304. "Like implied authority, apparent authority to settle is not conferred simply by the retention of an attorney ...." *Id.* The Court concluded that an attorney may settle a case on behalf of his client *only* if he is acting with *actual* authority. *See id.* at 1303–04.

■ Like federal common law, Indiana adopts the Restatement's definition of actual authority. *See* RESTATEMENT (SECOND) OF AGENCY § 26; *Scott*, 697

---

**6.** As we discuss *infra* with respect to Indiana law: federal common law allows an attorney to settle a case on behalf of his client only if he is acting with actual authority, *see United States v. Beebe*, 180 U.S. 343, 351–52, 21 S.Ct. 371, 45 L.Ed. 563 (1901) (noting that mere representation of a client does not provide an attorney the authority to settle a client's case); *Morgan v. South Bend Community Sch. Corp.*,

797 F.2d 471, 478 (7th Cir.1986) (noting that federal common law requires actual authority to settle a case); and federal common law of agency defines actual authority in line with the RESTATEMENT (SECOND) OF AGENCY, *Moriarty v. Glueckert Funeral Home, Ltd.*, 155 F.3d 859, 865 & n. 15 (7th Cir.1998) (citing RESTATEMENT (SECOND) OF AGENCY § 26).

N.E.2d at 66 (citations omitted). Actual authority is created by "written or spoken words ... of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account." *Scott*, 697 N.E.2d at 66 (citing *Drake v. Maid–Rite Co.*, 681 N.E.2d 734, 737 (Ind.Ct.App. 1997)). To determine whether actual authority was imparted by the client to his attorney in our case, we will conduct an objective review of the communications that occurred between Pohl and Herrmann.

As we have previously noted, Herrmann and Pohl had a series of conversations between December 15, 1998 and February 24, 1999. Herrmann testified that through these conversations he kept Pohl informed about the course of settlement negotiations, that he covered both the elements of the settlement agreement and the extent of his authority to settle the case. Moreover, Herrmann testified that Pohl granted Herrmann his "express permission" to agree to the terms of the settlement agreement and "granted [me] authority to settle the case on his behalf for all the crediting of the ESOP, all the things contained within the settlement agreement, and specifically the $15,000 in attorneys' fees." Although Pohl testified that he never specifically agreed to dismiss Counts I or II, he admits that he and his attorney had discussed settling Count III. More importantly, at no point does Pohl contradict Herrmann's testimony that he (Pohl) "granted [Herrmann] authority to settle the case on his behalf." Pohl's statement to Herrmann to "settle the case" constitutes actual authority.

Herrmann's letter to Pohl on March 8, 1999, expressly confirmed the "settlement of [Pohl's] current federal case against United Airlines." Although the letter makes no explicit reference to the settlement including all three claims, Herrmann testified that he told Pohl that he was only able to recover "attorney fees [sic] that were incurred as a result of the military

discrimination suit," not fees incurred as a result of Pohl's separate ADA suit. Herrmann's letter informs Pohl that he will need to sign and return the settlement agreement as soon as possible after receiving it "so that we can go forward with your ADA claim."

Having received this letter, Pohl never questioned Herrmann about the reference to the "current federal case" being settled. Despite their meeting on April 26, 1999 when discussions centered on their moving forward with Pohl's ADA case, Pohl did not challenge the representations or actions laid out in the March 8 letter or question Herrmann concerning its contents. In fact, Pohl testified at the hearing that when he received the letter he was not concerned about whether the letter meant that the entire case was being settled due to his interpretation of the marginal note he had inserted into the original retainer agreement with the Firm requiring his "authorization" of any settlement.

Whatever Pohl's interpretation of his marginal note in the retainer agreement may be, it is clear that he did give his oral authorization to "settle the case," which made Herrmann's conclusion that the settlement included all three Counts of the Complaint objectively reasonable. Our holding in this regard is further supported by events at the December 15, 1998 conference with Magistrate Judge Shields and thereafter. Herrmann and Clark testified that neither Judge Shields, Herrmann, Haskin, nor Clark felt that Counts I or II had any legal merit to them. At the conclusion of the court conference, the fact that the attorneys were able to quickly frame the terms of a settlement agreement indicates that they all harbored a shared assessment as to the merits of each of the three Counts. Considering that Counts I and II were viewed by the attorneys and the judge as not meritorious, their belief that the case could be settled if the parties could agree to a method for crediting Pohl's ESOP accounts was credible and reasonable. Herrmann's inference from

Pohl's authorization to "settle the case" that settlement would include all three Counts is thus as a matter of law objectively reasonable.

Despite the reasonableness of Herrmann's actions, Pohl apparently believed that no settlement would be final until he "signed off on it." This assumption was premised upon Pohl's interpretation of his marginal note affixed next to part X of the Firm's retainer agreement, "with my authorization." We cannot conclude that this marginal note vested final "sign off" authority to settle the case in Pohl's hands; rather, this note does nothing more than require the Firm to obtain Pohl's authorization before obtaining a final settlement of the case on his behalf, which we have determined did occur. It is clear, therefore, that the retainer's requirements were satisfied.

We repeat for emphasis: the oral agreement reached between Herrmann and Clark was a binding settlement agreement. The marginal note on the retainer agreement required Herrmann, on behalf of the Firm, to obtain Pohl's authorization before entering into the binding oral agreement with Clark on February 24, 1999. At the point Pohl authorized Herrmann to "settle the case," which occurred prior to Herrmann's reaching the agreement with Clark on February 24, Pohl exercised the power that he had reserved for himself by his marginal note in the retainer agreement. As a matter of well settled law, settlement agreements are strongly favored both by the public policy of Indiana,

see, e.g., *In re Assignment of Courtrooms, Judge's Offices, and Other Court Facilities,* 715 N.E.2d 372, 376 (Ind.1999), and federal policy. See *Armstrong v. Board of School Directors of City of Milwaukee,* 616 F.2d 305, 312 (7th Cir.1980); *Du Puy v. Director, Office of Workers' Compensation Programs,* 519 F.2d 536, 541 (7th Cir. 1975); *John Boettcher Sewer & Excavating Co.,* 803 F.Supp. at 1425. Herrmann acted within his authority to "settle the case" when he reached the oral agreement with Clark. Pohl may not now attempt to revoke his authority or otherwise attempt to obviate the binding force of the settlement agreement to which he previously agreed and which he previously authorized his attorney to negotiate. See *Taylor,* 793 F.2d at 862; *Klebes,* 607 N.E.2d at 982. Accordingly, we *GRANT* United's motion to enforce the settlement agreement previously reached between United and Pohl, through Herrmann, his agent.[7]

### Conclusion

For the foregoing reasons, the Defendant's motion to enforce the settlement agreement is *GRANTED*,[8] in accordance with the terms of the February 24, 1999 oral agreement between Pohl, acting by and through his attorney, Herrmann, and United, acting by and through its attorney Clark, as memorialized in the Def. Ex. 1, Attach. B.

---

7. Although Pohl's current counsel speaks of the parties' mutual distrust for each other, Pohl is not left without recourse if he comes to believe at a later date that United has failed to perform under the settlement agreement. "Although settlement agreements differ from court ordered judgments, such agreements are nonetheless binding on the parties." *Natare,* 987 F.Supp. at 700. By exercising our power to enforce the parties' settlement agreement, we establish contractual rights which Plaintiff may seek to enforce in the future, should he find it necessary.

8. In addition to United's motion, there is also pending before us Plaintiff's Motion For Order to Compel and For Contempt Citation and the Firm's Motion For Distribution of Attorney Fees. Our resolution of United's motion to enforce resolves all dispositive issues with respect to these two motions as well. Accordingly, Plaintiff's Motion for Order to Compel and For Contempt Citation is *DENIED* as moot and the Firm's Motion For Distribution of Attorney Fees is *GRANTED*. United is hereby ordered to pay the firm of Haskin Lauter Cohen & Larue the sum of $15,000 in accordance with the settlement agreement reached between United and Pohl.